CORRELATED DEVELOPMENT CORPORATION and Housing Consultants, Inc., a joint venture

v.

The UNITED STATES.

No. 314–72.

United States Court of Claims.

May 18, 1977.

---

**516**

John H. Tracy, Vienna, Va., for plaintiff. James T. Lewis, Vienna, Va., attorney of record. Lewis, Mitchell & Moore, Vienna, Va., and Worsham, Forsythe & Sampels, Dallas, Tex., of counsel.

Kenneth J. Ingram, Washington, D.C., with whom was Acting Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant. Gerald L. Schrader, Washington, D.C., of counsel.

Before DAVIS, Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Senior Judge.

Plaintiff, Correlated Development Corporation and Housing Consultants, Inc., a joint venture, entered into four contracts of sale on June 29, 1970, with four local housing authorities (LHA) in the State of Mississippi for the construction and sale by the plaintiff to the LHA of 240 low-rent housing units for the sum of $4,135,534. These units were to be constructed on an emergency basis to supply low-rent housing to persons in the area whose homes had been destroyed by Hurricane Camille. The LHA

were created pursuant to the Housing Act of 1937 (42 U.S.C. § 1401, *et seq.*) in order to be eligible for federal assistance in the construction and development of low-rent housing projects. The four contracts of sale involved here were called Accelerated Turnkey Contracts of Sale. These contracts of sale and the projects covered by them are listed as follows:

(1) *Purchaser:* Mississippi Regional Housing Authority No. VIII—an agency of the State of Mississippi. *Project:* MISS 40–25—North Gulfport—50 units (one site location). *Construction Time:* 100-day completion. *Sales Price:* $889,953.

(2) *Purchaser:* Mississippi Regional Housing Authority No. VIII—an agency of the State of Mississippi. *Project:* MISS 40–24—D'Iberville—50 units (one site location). *Construction Time:* 100-day completion. *Sales Price:* $878,846.

(3) *Purchaser:* The Housing Authority of the Town of Waveland, Mississippi—an agency of the Town of Waveland, Mississippi. *Project:* MISS 101–1 75 units (three site locations). *Construction Time:* 115-day completion. *Sales Price:* $1,290,292.

(4) *Purchaser:* The Housing Authority of the City of Bay St. Louis, Mississippi—an agency of the City of Bay St. Louis, Mississippi. *Project:* MISS 64–3—65 units (one site location). *Construction Time:* 100-day completion. *Sales Price:* $1,067,443.

The opening paragraph of each contract of sale stated:

This agreement made this 29th day of June, 1970, by and between Correlated Development Corporation; Housing Consultants, Inc., a joint venture, hereinafter called the "Seller", and the * * * Housing Authority of * * *, hereinafter called the "Purchaser", a public body created and organized pursuant to and in accordance with the provisions of the laws of the State of Mississippi. WITNESSETH:

Each of the contracts of sale were signed by the parties named in the above opening paragraph. The United States was not a party to the contract, although a representative of the Secretary of Housing and Urban Development (HUD) of the United States approved the contracts by signing his name below the signatures of the parties beneath the word "approved." The purpose of this approval by the government is shown by Article IX in each of the contracts of sale as follows:

ARTICLE IX. *Approval by Government. The approval of this Agreement by the Government signifies* that the undertaking by the Purchaser of the acquisition of the property constitutes a "project" eligible for financial assistance under the Annual Contributions Contract identified in Exhibit "C"; that said Annual Contributions Contract has been properly authorized; that funds have been reserved by the Government and will be available to effect payment and performance by the Purchaser hereunder; *and the Government's approval of the terms and conditions hereof.* [Emphasis supplied.]

Each of the contracts of sale contained Articles XI and XII which provided in pertinent part as follows:

ARTICLE XI. *Contract of Sale.* The provisions of the Contract of Sale covering the Property are embodied in this Agreement; Exhibit "A" hereto containing the working drawings, specifications and conditions relating to the improvements; Exhibit "B" hereto, containing the description of the land upon which the improvement will be situated; and Exhibit "C" hereto, containing the Annual Contributions Contract, each of which Exhibits has been inscribed with the initials of the parties hereto or otherwise appropriately identified.

ARTICLE XII. *Prohibition Against Transfer of Contract or Property.* The Seller agrees that he has not made, and will not make or agree to make, any sale, assignment, conveyance, or transfer in any other form, of this Contract or the Property, or any part thereof or any interest therein, except as follows:

1. To an entity to which this Contract has been assigned with the prior written consent of the Purchaser and the Government.

2. To a mortgagee for the purpose of obtaining financing of the completion of the Property.

For the purposes of this Article, a transfer of stock in the Seller, in whole or in part, by a party holding ten percent or more of the stock of the Seller, or a transfer by more than one stockholder of the Seller of ten percent or more of the stock of the Seller, or any other similarly significant change in the ownership of such stock or in the relative distribution thereof, or with respect to the parties in control of the Seller or the degree thereof, by any other method or means, whether by increased capitalization, merger with another corporation, corporate or other amendments, issuance of new or additional stock or classification of stock or otherwise, shall be deemed an assignment or conveyance with respect to this Contract or the Property. With respect to this provision, the Seller and the parties signing this Contract on behalf of the Seller represent that they have the authority of all of its existing stockholders to agree to this provision on their behalf and to bind them with respect thereto. The Seller agrees to notify the Purchaser promptly of any such proposed transfer and to request written approval thereof.

The members of the plaintiff joint venture were not financially able to perform the contracts of sale when the contracts were signed, as they were "shell" corporations. In order to obtain the necessary funds with which to perform the contracts, the members of the joint venture sold all of their capital stock and assigned their interests in the contracts of sale to Gifco Development Company (GIFCO) and First Coastal Corporation (Coastal). This sale and assignment provided in pertinent part as follows:

THIS AGREEMENT made the ——— day of July, 1970, by and between CORRELATED DEVELOPMENT CORPORATION ("Correlated"), a Texas corporation, HOUSING CONSULTANTS, INC. ("Housing"), a Mississippi corporation, and GIFCO/COASTAL, a Joint Venture ("GIFCO/Coastal"), and joined herein for the purposes stated by the below-named governmental agencies,

WITNESSETH:

RECITALS:

1) WHEREAS, Correlated and Housing have entered into Contracts of Sale with [Authorities] * * * for the sale of completed properties consisting principally of 240 dwelling units, related appurtenances (herein called "Improvements") and land, * * *; and

2) WHEREAS, the Authorities and the United States Department of Housing and Urban Development ("HUD") have reviewed the plans and specifications relating to the said properties and HUD has committed itself to make available sufficient funds to enable Authorities to purchase the Improvements upon satisfactory completion thereof; and

3) WHEREAS, GIFCO DEVELOPMENT COMPANY, a Texas corporation ("Gifco"), and FIRST COASTAL CORPORATION, a Texas corporation ("Coastal") have acquired 100% of the capital stock of Correlated and Housing * * *; and

4) WHEREAS, Correlated and Housing desire to assign all sums of money due or to become due pursuant to said Contracts of Sale to Gifco/Coastal; and

5) WHEREAS, Coastal, Correlated and Housing desire to obtain, and Gifco is willing to make available, financial assistance in connection with construction of the improvements, whereby Gifco shall acquire, in its name, the property described in said Contracts of Sale * * * for

and on behalf of Gifco/Coastal and otherwise make available interim financing for construction of the Improvements; and

6) WHEREAS, Authorities and HUD are agreeable to the foregoing;

NOW, THEREFORE, it is hereby agreed as follows:

1) For and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration in hand paid to Correlated and Housing by Gifco/Coastal, the receipt and sufficiency of which is hereby acknowledged and confessed by Correlated and Housing, respectively, Correlated and Housing, jointly and severally, assign to Gifco/Coastal all sums of money due or to become due to Correlated and Housing, their successors and assigns, and each of them, pursuant to the Contracts of Sale * * *, and Correlated and Housing, jointly and severally, hereby authorize and direct the United States Department of Housing and Urban Development, [the Authorities] * * *, their predecessors, successors and assigns, and any other agency of the United States or any department thereof, or the State of Mississippi or any municipality or agency thereof, to pay all sums of money due pursuant to the said Contracts of Sale as heretofore and hereafter amended direct to Gifco/Coastal, in its name, or the name of its successor of assign, * * *

* * * * * *

3) HUD and the Authorities hereby consent and agree to the foregoing assignment and the * * * sale of the capital stock of Correlated and Housing to Gifco and Coastal, and for valuable consideration, hereby agree to pay direct to Gifco/Coastal, in its name, all sums of money due or to become due pursuant to the Contracts of Sale * * *.

4) HUD and the Authorities agree and consent to the acquisition of necessary interests in the property described in * * * [the Contracts of Sale] by Gifco, in its name, but for and on behalf of Gifco/Coastal for purposes of interim financing, notwithstanding title to the property shall be conveyed pursuant to Article VII of the Contracts of Sale.

▆ Plaintiff contends that the foregoing approval of the sale and assignment by plaintiff to Gifco/Coastal on the part of HUD obligated the government to perform the contracts of sale and made it liable for any breaches thereof by LHA. We do not agree. HUD was required by paragraph XII of the contracts of sale, *supra,* to approve the sale of plaintiff's capital stock and its assignment of its interests in the contracts of sale before they would be effective. It is obvious that HUD did not obligate the government to perform the contracts of sale nor make it liable for any alleged breach thereof as alleged by plaintiff. In this regard, the government acted in its sovereign capacity. The approval of the agreement in this instance by HUD only indicated that HUD would make funds available to the Authorities (LHA) by way of loans and annual contributions, as specified in the annual contributions contracts described below, so that the LHA could pay for the construction of the housing units to Gifco/Coastal (and not to plaintiff). The loans and contributions were gratuities from the government to the LHA to provide low-rent housing for the people, and in making them the government was acting in its sovereign capacity. There was no privity of contract between HUD and the plaintiff with respect to the performance of the contracts of sale by the purchasers by reason of HUD's approval of the sale and assignment contract aforesaid, nor did such approval impose any liability on the government with respect to the performance of the contracts of sale by the purchasers. HUD's only purpose in approving the agreement was to make it possible for the plaintiff to obtain the necessary financing from Gifco/Coastal with which to construct the housing projects. HUD did not make the Government a party to the contracts of sale by such approval.

As shown above in Article XI of the contracts of sale, there was attached to such contracts as Exhibit "C" the Annual Contributions Contracts of June 29, 1970,

between HUD and the LHA. Plaintiff was not a party to the annual contributions contracts, which were agreements between HUD and the LHA whereby pursuant to the Housing Act the government was to lend up to 90 percent of the cost of the housing projects and was to make annual contributions to the LHA for 40 years. The LHA was to repay the loans with interest from funds raised by the sale of bonds which LHA agreed to issue in connection with the projects. The provisions relating to the annual contributions and the issuance of the bonds were contained in Sections 8 and 9 as follows:

Sec. 8. *Annual Contributions by Government*

Subject to and in accordance with all the provisions of Part Two hereof, and in order to assist in achieving and maintaining the low-rent character of each Project, the Government shall make annual contributions to the Local Authority in respect to each Project in the amounts as determined pursuant to Part Two and for not to exceed the period (herein called "Maximum Contribution Period") commencing on the date the first annual contribution with respect to such Project is paid and ending forty years from each date. Not more than forty annual contributions shall be made with respect to any Project.

Sec. 9. *Bonds and Additional Projects*

The Local Authority shall authorize, issue, and sell to others than the Government, obligations of the type prescribed in Sec. 411 (herein called the "Bonds"), all as prescribed in Part Two of this Contract, with respect to the Projects and to any other low-rent housing project or projects undertaken by the Local Authority with financial assistance of the Government which, pursuant to mutual agreement of the Local Authority and the Government, may be incorporated under the terms of this Contract.

The annual contributions contracts contained other provisions as to the rights of third parties against the government by reason of the contributions contracts as follows:

Sec. 510. *Rights of Third Parties*

(A) *The Government covenants and agrees with and for the benefit of the holders from time to time of the Bonds* and of interest claims thereunder, that it will pay the annual contributions pledged as security for such Bonds and interest pursuant to this Contract. To enforce the performance by the Government of this covenant *such holders, as well as the Local Authority shall have the right to proceed against the Government* by action at law or suit in equity.

(B) *Nothing in this Contract contained shall be construed as creating or justifying any claim against the Government by any third party other than as provided in subsection (A) of this Sec. 510.* [Emphasis supplied.]

It will be noted that third parties such as the plaintiff here, who is not a bond holder, are barred from maintaining a claim against the government by reason of the above Section 510(B) of the contributions contracts. Nevertheless, the plaintiff contends that it has a right to maintain this suit because of Section 13 of the annual contributions contracts, which is as follows:

Sec. 13. *Special Provision for Project being Constructed by the Turnkey Method*

The Local Authority will acquire Project No. Misc-101–1 pursuant to a Contract of Sale to be entered into between the seller and the Local Authority. Prior to the execution of such Contract of Sale the Local Authority may issue a Letter of Intent to the Seller to enter into such Contract. Such Letter of Intent and such Contract shall bear the written approval of the Government. Failure of the Local Authority to expeditiously continue the undertaking of the Project or to comply with the Letter of Intent or Contract, or if the Letter of Intent or Contract is held to be void, voidable or ultra vires, or if the power or right of the Local Authority to issue the Letter of Intent or enter into the Contract of Sale is drawn into question in

any legal procedure, or if the Local Authority asserts or claims that the Letter of Intent or Contract is not binding upon the Local Authority for any reason, the occurrence of any such event, if the seller is not in default, shall constitute a Substantial Default for the purpose of Article V hereof and, in such case, the Government will continue the undertaking of the Project and will take delivery of such right, title or interest in the Project as the Local Authority may have and perform such Letter of Intent or Contract of Sale, as the case may be. The provisions of this paragraph are made with, and for the benefit of the seller and his assignees who will have been specifically approved by the Government prior to such assignment. To enforce the performance of this provision the seller and such assignees, as well as the Local Authority, shall have the right to proceed against the Government by action at law or suit in equity.

■ We do not agree that Section 13 gives the plaintiff the right to maintain this suit against the government. The simple answer to plaintiff's argument in this regard is the fact that none of the contingencies mentioned in Section 13 ever occurred. There was never a substantial default by LHA; the government never took over nor completed the projects nor was ever requested to do so by the LHA or the plaintiff; nor was the right, title, or interest of LHA in the projects ever delivered or transferred to the government. As a matter of fact, all of the projects were completed by the LHA and closing documents were signed, including releases executed by plaintiff, on the following dates, and plaintiff was paid the full contract price of $4,135,534, less $40,725 retained as liquidated damages:

a. Mississippi Regional Housing Authority No. VIII—North Gulfport—28th Street—January 27, 1971.

b. Mississippi Regional Housing Authority No. VIII—D'Iberville—March 11, 1971.

c. The Housing Authority of the Town of Waveland, Mississippi, Stage 1, Sites 2 and 3—April 2, 1971.

d. The Housing Authority of the Town of Waveland, Mississippi, Stage 2, Site 1—May 11, 1971.

e. The Housing Authority of the City of Bay St. Louis, Mississippi—May 26, 1971.

We now come to a more detailed discussion of the claims plaintiff asserts in this case against the government. Plaintiff asks for damages, increased construction costs, lost profits, recovery of withheld liquidated damages, and overhead, from the government in the sum of $2,495,828, plus interest thereon, in connection with its performance of the contracts of sale. Plaintiff claims the LHA made changes in the work without granting time extensions, which increased its costs and entitled it to increased compensation and recovery of the withheld liquidated damages. It alleges that the government was responsible for such actions of the LHA by reason of the acts of representatives of HUD and is liable for the costs resulting therefrom.

The government alleges by way of defense that there was no privity of contract between it and the plaintiff; that in approving the contract for the sale of plaintiff's stock and assignment of interest in the projects, and in approving the contracts of sale and in signing the annual contribution contract, it was acting in its sovereign capacity and by virtue thereof is not liable to plaintiff; that there was no substantial default by LHA of the annual contribution contract and HUD never took over the projects or title to the property nor finished the construction of the projects, because the LHA finished all of the projects; that the plaintiff was paid the full contract price for all of the projects; that no officer or representative of HUD had authority to make any agreement or do any act outside of the cited contracts that would bind the government; and that plaintiff signed releases and hold harmless agreements when the projects were completed releasing LHA from all claims, which had the effect of releasing the government from all the claims plaintiff now asserts against it.

Plaintiff alleges four basic reasons why it should be allowed to recover the above items from the government in this action, none of which are persuasive, and all of which are foreclosed and disposed of adversely to plaintiff's theories by the decisions of this court in *D. R. Smalley & Sons, Inc. v. United States,* 372 F.2d 505, 178 Ct.Cl. 593, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967); and *Housing Corp. of America v. United States,* 468 F.2d 922, 199 Ct.Cl. 705 (1972). The four reasons advanced by plaintiff which it alleges support a recovery by it from the government are as follows:

(1) The government made itself a party to the contracts of sale by its dominant control and supervision of every phase of the contracts, including the following acts, among others:

(a) Preparation of all contract forms;

(b) Approval of the contracts, plans, and specifications;

(c) Requirement and approval of the stock transfer and assignment by plaintiff to Gifco/Coastal;

(d) Negotiation of the prices and times of performance of the projects;

(e) Making of decisions regarding the lift station and drainage channel at Bay St. Louis;

(f) Refusing to allow the LHA to pay plaintiff for hurricane straps on the buildings;

(g) Refusing to allow the LHA to grant time extensions;

(h) Approval of the titles to the properties; and

(i) Preparation of the closing papers and releases and requiring plaintiff to sign them before LHA could make payment.

This problem was present in the *Smalley* case where the government was furnishing to the State of Ohio 90 percent of the cost of building an interstate highway in that state. The contractor plaintiff there made the same arguments the plaintiff is making here in its suit against the government. The acts of the representatives of the government with reference to the performance of the contracts in that case were much like those in the instant case. In deciding that case in favor of the government, we held that the contribution of the government was a gratuity and in making it the government was acting in its sovereign capacity and was not liable to pay the contractor anything by reason of requiring the highway to meet certain standards before the grant would be made. We stated in our opinion in that case as follows, which is very much in point here and which disposes of plaintiff's instant claim adverse to it:

When Congress passed the Federal-Aid Highway Acts which obligated the Government to reimburse the states to the extent of ninety per cent of the cost of construction of any approved highway that was a part of the Federal interstate system of roads, it exercised sovereign powers of the Government. Likewise, the establishment of standards and requirements, the approval of the form of contract, the inspection of work, and the payment of ninety per cent of the cost of each project to the state involved by the Bureau of Public Roads, were sovereign acts of the Government and were not directed solely to the plaintiff but affected the general public and were done for the common good and the general welfare.

It is well established that the Federal Government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity. *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925); *Jones v. United States,* 1 Ct.Cl. 383 (1865).

The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be

wasted. See *Mahler v. United States,* 306 F.2d 713, 716–722 (3rd Cir. 1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. These grants are in reality gifts or gratuities. It would be far-fetched indeed to impose liability on the Government for the acts and omissions of the parties who contract to build the projects, simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a part of the costs. [372 F.2d at 507, 178 Ct.Cl. at 597–98.]

(2) Plaintiff contends that the government has taken its property without just compensation in violation of the fifth amendment to the Constitution. The same argument was made by the plaintiff in the *Smalley* case. In rejecting the argument, the court held:

We now come to the claim of plaintiff that defendant has deprived it of its property without compensation in violation of the fifth and fourteenth amendments to the Constitution. All of the acts and omissions complained of by plaintiff were those of the State of Ohio. It does not allege a single affirmative act on the part of defendant that deprived it of any of its property nor that interfered with or disturbed its property rights in any way. Without such allegations, plaintiff cannot recover damages from defendant on this theory. *Biggs Rental Co. v. United States,* 353 F.2d 1013, 1017, 173 Ct.Cl. 789, 796 (1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1443, 16 L.Ed.2d 531 (1966). [372 F.2d at 508, 178 Ct.Cl. at 598–99.]

■ We adhere to that ruling and apply it to the instant case. There has been no taking of plaintiff's property by the United States, and plaintiff cannot recover on this theory. Besides, plaintiff conveyed the properties to the LHA by warranty deeds and was paid for the conveyances. If plaintiff has any grievance, it is against the LHA and not the government.

(3) Plaintiff contends that there was privity of contract between it and the government by reason of the fact that HUD ap-proved the contract between plaintiff and GIFCO/Coastal for the sale of its capital stock and the assignment of its interest in the projects. We have rejected this argument, *supra,* on the ground that in approving the contract, the government was acting in its sovereign capacity, was not a party to the contract, and such approval did not confer any rights on the plaintiff against the government.

■ Also, plaintiff contends that because HUD approved the contracts of sale and because of Section 13 of the annual contributions contract there was privity of contract between it and the government that made the government liable for alleged breaches of contract by the LHA and conferred on plaintiff the right to maintain this suit. Here again, we have already rejected this argument, *supra,* by holding that the approval of the contracts of sale by HUD and the provisions of Section 13 of the annual contributions contract did not create privity of contract between the plaintiff and the government, and, furthermore, the government was acting in its sovereign capacity in connection with such contracts. The case of *Housing Corp. of America, supra,* is for the most part on all fours with the instant case and is dispositive of most of the present litigation adverse to the plaintiff and in favor of the government. In that case, which involved the same types of contracts we have here, we held:

* * * The question for resolution by the pending motion is whether plaintiff on its Contract of Sale with the Monroe Housing Commission, which contract was approved by defendant as eligible for financial assistance under defendant's Annual Contributions Contract with the Commission, has a claim within the jurisdiction of the Court of Claims against defendant for unapproved changes for additional work. The question must be answered in the negative.

The opening paragraph of the May 9, 1969 Contract of Sale states:

This Agreement made this 9 day of May, 1969, by and between Housing

Corporation of America, a Delaware Corporation, hereinafter called the "Seller," and the Monroe Housing Commission, Monroe, Michigan, hereinafter called the "Purchaser," * * .

*This makes it rather clear who the parties are and defendant is not one of them.* However, defendant's signature of approval at the bottom of the document, plus Article IX quoted above, cause plaintiff to contend that defendant must be considered a party and to have waived its sovereignty. * * *1 [Emphasis supplied.] [468 F.2d at 924, 199 Ct.Cl. at 709.]

The court held further in that case: The contract here in issue is one of many pursuant to which the Federal Government subsidizes projects of state and local authorities for the public betterment. *The United States, however, does not make itself a party to the contracts relating to said projects but obligates itself by separate agreements, as here, to local authorities for the funding of those projects it approves.* The significance of that approval is spelled out here in Article IX. This does not create an express or implied contract between plaintiff and defendant, nor does it make the Commission defendant's agent through HUD. *HUD's actions were performed in defendant's capacity as sovereign.* This principle has been settled for some time by a similar case involving construction under the Federal-Aid Highways Act. *D. R. Smalley & Sons v. United States,* 372 F.2d 505, 178 Ct.Cl. 593, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). The *Smalley* case is squarely in point. [Emphasis supplied.] [468 F.2d at 924, 199 Ct.Cl. at 710.]

We also stated in that case: Remaining for disposition are plaintiff's contentions that it has third-party beneficiary rights arising principally from Article IX of the Contract of Sale between plaintiff and the Commission. This is so, plaintiff says, because defendant approved Article IX which constitutes this specific project as one eligible for financial assistance and which states that funds have been reserved by the Government and *"will be available to effect payment and performance by the Purchaser."* [Emphasis supplied.] This, plaintiff alleges, shows an intention in the Contract of Sale to create a body of enforceable rights in plaintiff under that provision which was inserted for the benefit of plaintiff as well as to benefit the Monroe Housing Commission. Plaintiff asserts that it is only upon the guarantees of payment by defendant that contractors and developers ordinarily undertake projects of the type here involved.

Plaintiff places heavy reliance on *Hebah v. United States,* 428 F.2d 1334, 192 Ct.Cl. 785 (1970), which recognized a third-party beneficiary relationship in certain circumstances where performance of a promise in a contract will benefit a person other than the promisee. * * * Further, section 510 of the Consolidated Annual Contributions Contract specifically bars third-party actions against the Government except by the bondholders, which would seem to preclude a *Hebah*-type action under that contract.

Plaintiff seeks to enforce its Contract of Sale with the Commission upon defendant, *which is not a party to that contract.* The language of Article IX, *supra,* in the Contract of Sale speaks in terms of defendant making funds available *"to effect payment and performance by the purchaser hereunder."* [Emphasis supplied.] *This is not a provision obligating the United States to pay the seller (plaintiff) anything.*

In summary, *there was no privity of contract between defendant and plaintiff, express or implied.* Defendant has not consented to be sued by a third party in connection with its contractual arrangements with the Monroe Housing Commis-

---

1. Article IX in the contract of sale in that case was the same as Article IX in the contracts of sale in the present case.

sion. *Defendant's actions in approving the Contract of Sale between plaintiff and the Commission and in funding such contract were sovereign acts which do not subject defendant to liability.* Article IX of the Contract of Sale created no obligation upon defendant which is enforceable by plaintiff. * * * [Emphasis supplied.] [468 F.2d at 925–26, 199 Ct.Cl. at 712–13.]

We hold that the decision in that case is dispositive against the plaintiff of its claim of privity of contract with the government in the instant case.

■ (4) Finally, the plaintiff argues that certain officials of HUD, by their requirements and dealings with the plaintiff during construction of the projects created contractual obligations on the government in favor of the plaintiff. The government denies this allegation and has furnished affidavits of the officials in question which assert that they had no authority to impose contractual obligations on the government with reference to these projects. The plaintiff has not proved otherwise. This question was present in the *Housing Corp. of America* case, *supra,* where we held:

It is evident that neither of these HUD officials was a contracting officer nor authorized to commit defendant to any financial obligations of a contractual nature directly with private parties. The United States is not bound by the unauthorized acts of its agents. Here, assuming that plaintiff's recollection of events is correct, it has not shown that Sabella and Brown acted within their authority. It is plaintiff's responsibility to make such a showing and plaintiff is deemed to have notice of their limited authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *National Bank of N. America v. United States,* 456 F.2d 754, 197 Ct.Cl. 948 (1972); *California-Pac. Util. Co. v. United States,* 194 Ct.Cl. 703 (1971); *Fountain v. United States,* 427 F.2d 759, 192 Ct.Cl. 495 (1970), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *Miami Metropolitan Bldg. Corp.*

*v. United States,* 180 Ct.Cl. 503 (1967). [468 F.2d at 925, 199 Ct.Cl. at 711–12.] [Emphasis supplied.]

We think the decision of this court in that case is equally applicable to the same issue in this case.

In view of our conclusions set forth above, we have determined that it is not necessary to reach the issue of releases and hold harmless agreements nor any other issue raised by the parties.

Both parties have filed motions for summary judgment and the case is before the court on such motions. We have concluded that defendant's motion should be granted and that of the plaintiff denied.

Accordingly, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's petition is dismissed.

DAVIS, Judge, concurring:

I join generally in Judge Skelton's opinion though I do not find the case as open-and-shut as he does, and do not agree with everything he says. My problem is Section 13 of the standard annual contributions contract, which was not openly placed before the court, and was not considered by it, in *Housing Corp. of America v. United States,* 468 F.2d 922, 199 Ct.Cl. 705 (1972). Literally read, the complicated text of that provision seems to me to cover this very case. It says: "Failure of the Local Authority * * * to comply with the Letter of Intent or Contract * * * the occurrence of any such event, if the seller is not in default, shall constitute a Substantial Default for the purpose of Article V hereof, and, in such case, the Government will * * * perform such Letter of Intent or Contract of Sale, as the case may be. The provisions of this paragraph are made with, and for the benefit of the seller and his assignees who will have been specifically approved by the Government prior to such assignment. To enforce the performance of this provision the seller and such assignees, as well as the Local Authority shall have

the right to proceed against the Government by action at law or suit in equity."

My conclusion that Section 13 should not be read literally rests upon a number of intertwined considerations:

(a). Despite its overbroad language, the prime purpose of the section seems to be to protect the seller against a total default by the Local Authority—*i. e.* a refusal or inability to buy, pay for, and take over the project—not to provide a means of redressing various subordinate construction claims, as here, by a seller whose project has been taken over and paid for by the Local Authority.

(b). To accept plaintiff's literal reading of Section 13 would open up the Federal Government to liability for a mass of construction claims of all varieties (on projects taken over by Local Authorities) which it is difficult to believe the United States (or the parties) contemplated—in the absence of an affirmative showing that that was indeed the intention.

(c). The simultaneous presence in the contributions contract of Section 510(b) (also quoted in the court's opinion)—limiting third party rights to a very narrow class—warrants us in giving Section 13 a restricted, rather than expansive, interpretation—again, absent convincing proof that Section 13 means everything it says.

(d). Section 13 has been standard for quite some time but plaintiff has not shown, or even offered to show, that the provision has been generally interpreted, either by the Government or by the sellers, as covering the kind of subordinate construction claims involved here.[1] Nor has there even been any showing, or offer to show, that the section has been so much invoked by other sellers for claims of this type that a trial is warranted as to the customary understanding of the clause. (Plaintiff has itself moved for summary judgment without any affidavits or other material bearing on the general or customary understanding of Section 13.)

---

1. There is some significance to the fact that it was not even thought worthy of argument by

the contractor in *Housing Corp. of America, supra.*