James C. PENDLETON, Sr.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–161L.

United States Court of Federal Claims.

Aug. 28, 2000.

James C. Pendleton, Sr., Madison, Indiana, pro se.

Michael K. Martin, Washington, D.C., for defendant. Daniel W. Kilduff, United States Department of the Interior, Office of the Solicitor, of counsel.

## OPINION

ANDEWELT, Judge.

### I.

In this action, plaintiffs, James C. Pendleton, Sr., Edith L. Pendleton, and Georgia P. Surer, seek compensation from the United States for a series of actions allegedly taken by the United States Department of the Interior's Office of Surface Mining (OSM), in coordination with several agencies of the Commonwealth of Kentucky, pursuant to the Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. §§ 1201–1328 (1994). Plaintiffs, appearing *pro se,* allege that these actions taken with respect to their property located in Perry County, Kentucky, had the effect of ceding certain of plaintiffs' land to a neighbor, denying plaintiffs access to portions of their land and to a country road leading to a family cemetery, destroying timber on plaintiffs' land, and causing plaintiffs to suffer legal as well as other out-of-pocket expenses. Plaintiffs seek compensation for the alleged taking of their property in violation of the Fifth Amendment to the United States Constitution, for alleged due process violations, and for alleged fraudulent and tortuous actions. This action is before the court on defendant's motion for summary judgment. A grant of summary judgment is appropriate where there is no genuine issue of material fact (*i.e.,* a fact that might affect the outcome of the suit) and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Herein, the parties have addressed each of plaintiffs' claims and there are no material issues of fact in dispute. For the

reasons set forth below, the court concludes that defendant is entitled to judgment as a matter of law.

### II.

Plaintiffs' property is located adjacent to property owned and occupied by Lawrence and Ovilla Gayheart. In early 1993, the Gayhearts filed a complaint with the Commonwealth of Kentucky's Natural Resources and Environmental Protection Cabinet, Department for Surface Mining Reclamation and Enforcement, Division of Abandoned Lands (DAL). The complaint alleged that a landslide had occurred on their property due to surface mining that took place in the 1960s. After conducting a preliminary inspection on March 25, 1993, DAL determined that the site potentially met emergency criteria and referred the matter to OSM's London, Kentucky, Office. OSM conducted its own investigation and apparently determined that a landslide had occurred and that the potential existed for further damage. Because OSM already had expended all of its 1993 funds earmarked to address such emergencies, OSM referred the matter back to the Commonwealth of Kentucky for resolution.[1] The Kentucky DAL then applied to OSM under SMCRA for a permit and funding to conduct a reclamation project to protect the Gayheart property from further landslide damage (hereinafter referred to as the Gayheart Project). OSM approved the application on September 30, 1993.

DAL notified plaintiffs of the Gayheart Project on December 2, 1993. Plaintiff James C. Pendleton, Sr., protested the project and requested a hearing on the matter before Kentucky's Natural Resources and Environmental Protection Cabinet. A hearing for temporary relief was held on April 11, 1994. The hearing officer denied Pendleton's petition on the ground that Pendleton had failed to establish by a preponderance of the

---

1. Despite the numerous documents in the record indicating that OSM declared the Gayheart site as an emergency, defendant disputes this fact and points to one document that suggests that no such determination was made. In any event, whether OSM declared the site to be an emergency is not material to the resolution of defendant's motion for summary judgment because

the record is unambiguous that the reclamation work was not performed by the federal government pursuant to its emergency powers but rather by the Commonwealth of Kentucky pursuant to its state reclamation program provided in 30 U.S.C. § 1235 and 30 C.F.R. pt. 917 (1994), which is described in more detail *infra.*

evidence that he could prevail in showing that the Gayheart Project was not necessary to protect public health, safety, and welfare. DAL, with funds from OSM, commenced the Gayheart Project soon thereafter, and completed the project on June 1, 1994. Plaintiffs filed the instant suit on March 6, 1998. Plaintiffs allege that the execution of the Gayheart Project involved moving a country road which resulted in the various effects and damages listed above.

### III.

The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use without just compensation. In *D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505 (1967), the plaintiff attempted to recover damages under a Fifth Amendment takings theory relating to Federal–Aid Highway contracts entered by the State of Ohio. Plaintiff contended that because the United States, pursuant to the Federal–Aid Highway Acts, set forth the standards and regulations for the contracts, approved the contracts, inspected and approved the work as it progressed, approved changes in the plans, inspected and approved the final completion of the work, and agreed by the provisions of the law to pay 90 percent of the cost of the contracts, the federal government was the real party in interest and therefore subject to a takings claim. In rejecting this argument, the court determined that the level of federal government involvement, including requiring that the state meet certain federal standards, and, upon federal approval of the contracts, that the federal government reimburse the state agency, was insufficient to support a property owner suit against the United States under the Fifth Amendment's takings clause. The court explained its reasoning as follows:

All of the acts and omissions complained of by plaintiff were those of the State of Ohio. It does not allege a single affirmative act on the part of [the United States] that deprived it of any of its property nor that interfered with or disturbed its property rights in any way. Without such allegations, plaintiff cannot recover damages

from defendant on [a Fifth Amendment takings] theory.

*Id.*, at 599, 372 F.2d at 508; *see also Correlated Develop. Corp. v. United States*, 214 Ct.Cl. 106, 556 F.2d 515 (1977) (a takings claim did not lie where federal involvement was limited to issuing minimum standards and requirements, inspection and approval, and supplying most of the funds for the project).

Consistent with *Smalley*, evaluation of plaintiffs' takings claim herein requires a determination of whether federal involvement in the Gayheart Project was sufficient to support a takings claim against the United States. This evaluation turns on an analysis of the statutory and regulatory framework involved and the respective actions taken by the federal government and the Commonwealth of Kentucky.

### IV.

#### A. *The Statute and Related Regulations*

SMCRA was enacted to "promote the reclamation of mined areas left without adequate reclamation prior to August 3, 1977, and which continue, in their unreclaimed condition, to substantially degrade the quality of the environment, prevent or damage the beneficial use of land or water resources, or endanger the health or safety of the public." 30 U.S.C. § 1202(h). At the time of enactment, SMCRA was intended to create a cooperative venture between federal and state governments, with primary responsibility resting with the states. "[B]ecause of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States." 30 U.S.C. § 1201(f).

With this structure in mind, SMCRA generally grants the federal government oversight authority and responsibility for collecting and distributing funds while leaving the state in charge of developing its own specific programs for reclamation of lands within

the state.[2] The funds provided to the states by the federal government for reclamation projects are drawn from the Abandoned Mine Reclamation Fund (the Fund), which contains fees and charges imposed on mine operators. *See* 30 U.S.C. §§ 1231–1232. A certain percentage of the Fund's assets is distributed to the states for mine land reclamation purposes, including the "establishment of self-sustaining, individual State administered programs to insure private property against damages caused by land subsidence resulting from underground coal mining in those States." 30 U.S.C. § 1231(c)(1). To be eligible to receive payment from the Fund, a state must submit a reclamation plan for approval by the Secretary of the Interior. *See* 30 U.S.C. § 1235(b). A proposed state reclamation plan must include a designation of a state agency to administer the program, a statement indicating that the state agency has the authority to act, a description of the state agency's policies and procedures, a description of the management structure, a general description of the anticipated reclamation activities, and a general description of the geographic areas of the state where the reclamation projects will take place. *See* 30 C.F.R. § 884.13 (1994). Once a plan is approved, the Secretary "shall grant to the State exclusive responsibility and authority to implement the provisions of the approved program." 30 U.S.C. § 1235(d).

A state that has received approval of a reclamation plan may submit to the Secretary of the Interior annual applications for funds to support the state program and to implement specific reclamation projects. *See* 30 U.S.C. § 1235(f). The grant application consists of various forms, including an Application for Federal Assistance, Program Narrative Statement, Budget Information Report, and Budget Information–Construction Report. *See* 30 C.F.R. § 886.15(c). Federal regulations delineate certain issues the state should consider when designing a reclamation program, including, *inter alia*, mine drainage, active slides, erosion and sedimentation, vegetation, and toxic materials.[3] In addition, the grant application must include "[a] description of the actual or planned public involvement in the decision to undertake the work, in the planning of the reclamation activities, and in the decision on how the land will be used after reclamation...." 30 C.F.R. § 886.15(f). The regulations specify that the state is not required to submit complete copies of the plan and specifications for particular projects before the grant is approved or at the start of the project. *See* 30 C.F.R. § 886.15(e). Once a grant application is approved, a grant agreement is prepared, which includes a statement of the work to be covered by the grant, a statement of the approval of specific actions, the amounts approved for each individual project, and allowable transfers of funds to other federal, state, and local agencies. *See* 30 C.F.R. § 886.16(a). Although a state may assign functions or funds to other federal, state, and local agencies, the grantee agency must "retain responsibility for overall administration of that grant, including use of funds and reporting." 30 C.F.R. § 886.16(b). Once a state grant application is approved, the project is completed by the state. The design of the project, the solicitation of bids, and the award of a contract are all performed by the state.

The federal government performs functions that can be classified as oversight functions. The Secretary of the Interior is

---

**2.** In addition to establishing the criteria for state reclamation programs, SMCRA also specifies authority for federal reclamation projects under limited circumstances. The Secretary of the Interior can authorize federal abatement projects when "(1) an emergency exists constituting a danger to the public health, safety, or general welfare; and (2) no other person or agency will act expeditiously to restore, reclaim, abate, control, or prevent the adverse effects of coal mining practices." 30 U.S.C. § 1240(a). Therefore, federal reclamation projects take place only when "the danger is so imminent that time is not available for normal project contractual and budget procedures." 45 Fed.Reg. 14,813 (1980). This federal authority is not applicable to the instant case because the Gayheart Project was completed pursuant to a state reclamation program and did not involve the federal government exercising its authority to act on its own in an emergency situation.

**3.** *See, e.g.,* OSM Final Guidelines for Reclamation Programs and Projects, 45 Fed.Reg. 14,810–14,819 (1980).

charged with collecting the fees for and administering the Abandoned Mine Reclamation Fund. *See* 30 U.S.C. § 1231; 30 C.F.R. § 872.11. SMCRA specifies how revenue for the Fund is to be generated, for what purposes the funds may be spent, and the schedule for how the funds are to be distributed to the states. *See id.* The federal government determines generally what lands are eligible for reclamation projects, *see* 30 U.S.C. §§ 1233–1234; 30 C.F.R. § 874.12, and the Secretary of the Interior is charged with promulgating regulations pertaining to the statute, approving or disallowing proposed state reclamation programs, granting funds, monitoring the progress and quality of the state programs, and ensuring that each project is in compliance with a number of federal statutes, 30 U.S.C. § 1235. The Secretary of the Interior has the authority to suspend a state reclamation program if it is not in compliance with any provision of the regulations. *See* 30 U.S.C. § 1235(d); 30 C.F.R. § 884.16. The Secretary also is required to make annual reports to Congress on operations under the Fund and offer suggestions as to future use of the Fund. *See* 30 U.S.C. § 1241.

B. *Application of the Statute and Regulations to the Gayheart Project*

When the Gayhearts filed their complaint with the Kentucky DAL on March 25, 1993, DAL personnel immediately inspected the land. Because the site appeared to meet emergency criteria and to qualify for direct federal action, DAL referred the matter on that same day to the Department of the Interior's OSM. Ultimately, the OSM Assistant Director informed the state agency that federal emergency funds available for direct federal action had been exhausted for fiscal year 1993. The Gayheart Project was one of 30 projects formally referred back to the Kentucky DAL for possible treatment under the Commonwealth of Kentucky's state reclamation program provided in 30 U.S.C. § 1235 and 30 C.F.R. pt. 917. The Kentucky DAL then proceeded to seek funds pursuant to its state reclamation program for the Gayheart Project. It filed a "request for authorization to proceed" and sought a permit and funding from OSM. The request included a memoran-

dum from the Commonwealth of Kentucky's Natural Resources and Environmental Protection Cabinet Department of Law to DAL explaining the eligibility of the project, a topographic location map, and an Environmental Assessment, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370. The Environmental Assessment indicated that the objectives of the reclamation project are "to stop and stabilize the landslide, to protect the [Gayheart's] mobile home from damage or possible destruction, and to protect the cemetery access road from being further damaged and closed to vehicular traffic." The request proposed that these objectives would be met by removing the unstable material, controlling mine drainage and surface runoff by constructing subsurface drains, reinforcing surface drainage ditches, and promoting revegetation of the damaged areas. Straw bales were to be placed temporarily around the perimeter of the work area to control sedimentation, all disturbed surfaces were to be mulched and seeded, and construction was to involve disposal of excess spoil material. Nowhere in the request is it mentioned that any road would be moved, access to private property blocked, or trees removed.

OSM reviewed the request and determined in a "Finding of No Significant Impact" that the Gayheart Project would not have a significant negative impact on the environment, and that a failure to complete the project would not have favorable impacts on the environment. Thereafter, on September 30, 1993, OSM issued an "Authorization to Proceed with Construction Activity" stating that "OSM finds that all necessary documents for approval of construction activity [on the Gayheart Project] have been submitted" and authorizing DAL "to expend grant funds as requested for construction activities respecting the reclamation of the [Gayheart] site."

The Commonwealth of Kentucky informed Pendleton of the Gayheart Project and sought his consent to enter his land in connection with the project. Pendleton informed OSM that there was a lawsuit pending between himself and the Gayhearts concerning the property line and asked that the reclamation project be suspended until

the lawsuit was resolved. OSM then asked DAL to consider Pendleton's request. DAL ultimately decided to proceed with the project notwithstanding the Department of the Interior's inquiry and Pendleton was notified by letter of the impending project on December 2, 1993. DAL sent Pendleton an additional letter explaining that "[t]he project was referred with emergency status to Abandoned Lands by the [OSM], the federal agency with oversight responsibility" and that "[DAL] has determined they will proceed with the construction of the project." Throughout December 1993 and January 1994, DAL continued to investigate the site and solicit bids for the construction work. The project was executed soon thereafter and was completed on June 1, 1994. DAL issued a notice of final inspection on June 22, 1994, and OSM thereafter completed an oversight inspection report.

### V.

█ In our federal system, it is not uncommon for federal and state governments jointly to be involved in actions directed at improving the public welfare. When these actions give rise to potential liability under the Fifth Amendment's takings clause, it is necessary for the courts to determine whether the federal government, the state, or both should be deemed the responsible party. Actions taken pursuant to state approved reclamation programs under SMCRA are governed by the controlling precedent of *Smalley* detailed above. Applying that precedent, the Department of the Interior's participation in the Gayheart Project was not sufficient to give rise to a takings claim against the United States. The Gayheart Project was undertaken pursuant to the Commonwealth of Kentucky's approved state reclamation program. Pursuant to 30 U.S.C. § 1235(d), upon approval of a state reclamation plan, the Secretary of the Interior "shall grant to the State exclusive responsibility and authority to implement the provisions of the approved program." Consistent with this mandate, the Commonwealth of Kentucky selected the Gayheart site for reclamation and determined the objectives that had to be met to reclaim the land and the changes to the land that had to be made to accomplish these objectives. The Commonwealth of Kentucky defined the scope of the work, solicited bids, negotiated the contract terms, and hired the contractors to perform the work. SMCRA, like the Federal–Aid Highway Acts in *Smalley*, grants the federal government a role in the state's implementation of its projects. But the federal government's role, in pertinent part, is limited to establishing standards and regulations, approving grant contracts, and inspecting and paying for the work. The federal government herein did not determine to remove timber, move roads, restrict access to private land, or take an affirmative action that affected private land boundaries. As in *Smalley*, the affirmative acts complained of here were actions of the state and not the federal government. "[Plaintiffs do] not allege a single affirmative act on the part of [the federal government] that deprived [them] of any of [their] property nor that interfered with or disturbed [their] property rights in any way." *Smalley*, 178 Ct.Cl. at 599, 372 F.2d at 508. The federal government's involvement in the Gayheart Project simply is not sufficient to support a takings claim under the Fifth Amendment.

### VI.

█ Plaintiffs also seek compensation under the Federal Tort Claims Act, 28 U.S.C. § 2671, for damages arising out of fraudulent and illegal acts by the government. These alleged tortuous acts are the same acts that form the basis of plaintiffs' takings claim. The United States is immune from suit unless it consents to be sued by waiving its sovereign immunity. *See United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The Tucker Act, 28 U.S.C. § 1491, grants this court general subject matter jurisdiction over claims against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in

tort." Thus, this court does not have jurisdiction to entertain plaintiffs' tort claim.

## VII.

■ Finally, plaintiffs claim that "[e]stablished procedures of the Office of Surface Mining were not followed before action was taken." To the extent this is a due process claim, it too falls outside this court's jurisdiction. This court's jurisdiction is limited to those constitutional provisions that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967)). The due process clause of the Fifth Amendment is not money mandating. *See Dupre v. United States*, 229 Ct.Cl. 706, 1981 WL 28031 (1981). Hence, this court lacks jurisdiction over plaintiffs' due process claim.

### Conclusion

For the reasons set forth above, plaintiffs have failed to state a claim upon which relief can be granted or over which this court has jurisdiction. Thus, defendant's motion for summary judgment is granted and the Clerk of the Court shall enter judgment accordingly. No costs.

IT IS SO ORDERED.