**CIENEGA GARDENS, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–1C.

United States Court of Federal Claims.

March 27, 1995.

**202**

Milton Eisenberg, Washington, DC, for plaintiffs. Leonard A. Zax, Elliot E. Polebaum, and Laurie Oberembt, of counsel.

Richard E. Rice, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger and David M. Cohen, for defendant.

## OPINION

ROBINSON, Judge:

This case is before the court on defendant's motion for dismissal and plaintiff's cross-motion for partial summary judgment. Plaintiffs' complaint seeks damages for breach of contract (Count I), just compensation for a taking under the Fifth Amendment to the United States Constitution (Count II), and additional compensation based on allegedly unlawful administrative actions (Count III). Oral argument was held on November 30, 1994.

When the court considers matters presented by the parties outside of the pleadings, as it has in this case with respect to Counts I and II, it must treat defendant's motion to dismiss as a motion for summary judgment. The disposition of a case on a motion for summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). In evaluating a motion for summary judgment, the court must resolve any doubt about the existence of a material factual issue in favor of the nonmoving party. *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). Applying these standards, the court now grants defendant's motion for dismissal only with respect to Count III, plaintiffs' claim for damages for allegedly unlawful administrative actions. Plaintiffs' partial motion for summary judgment is granted with respect to Count I, plaintiffs' breach of contract claim; the court agrees with plaintiffs that trial is necessary to determine the damages, if any, flowing from defendant's breach. Finally, with regard to Count II, the taking claim, both parties' motions are denied.

### Factual Background

During the 1950s and 1960s, Congress enacted legislation to encourage private developers to construct, own and manage housing projects for low and moderate-income families. To implement the legislation, Congress authorized first the Federal Housing Administration and later the Department of Housing and Urban Development ("HUD" or "the agency")[1] to provide mortgage insurance to enable private lending institutions to provide low-interest mortgages to housing developers.

Housing developers also received financial incentives along with mortgage insurance, under either of two programs. The first, referred to as "Section 221," provided for below-market mortgage rates. Pub.L. 83–560, 68 Stat. 590, 597 (1954), *amended by* Pub.L. 87–70, 75 Stat. 149 (1961). Developers who obtained mortgages after 1968, however, were subject to a new provision enacted that year known as "Section 236." Developers who participated in Section 236 received market-rate mortgages with an interest subsidy. Pub.L. 90–448, § 201(a), 82 Stat. 476, 498, 499 (1968). In either case, developers were expected to pass these financial benefits

---

1. In 1965, the Federal Housing Administration, headed by the Federal Housing Commissioner, was subsumed into the newly established Department of Housing and Urban Development. *See* 24 C.F.R. §§ 200.1–200.4 (1994).

on to their tenants in the form of lower rents. *Id.*

Typically, when a developer received a HUD-insured mortgage under one of these programs, the developer signed a long-term deed of trust note [2] with a private lender; HUD endorsed the note. The repayment period on the loan was 40 years. Simultaneously, the developer entered into a "regulatory agreement" with the agency which placed certain conditions on the mortgages. Most importantly, the regulatory agreement imposed restrictions on the income levels of tenants, on the rents that could be charged, and on the rates of return that the developer could receive (collectively, "affordability restrictions"). The regulatory agreement imposed upon the owners several additional obligations, including a requirement to make all mortgage payments to lenders when due and to maintain substantial cash reserves—obligations which were designed to limit the government's financial exposure under its insurance contract.[3] The regulatory agreement, as well as the mortgage insurance provided by HUD, was to remain in effect as long as the mortgage loan remained outstanding.

The regulatory agreement made no mention of the owner's prepayment rights. However, a rider to the HUD-endorsed deed of trust notes expressly prohibited prepayment of the mortgages before 20 years from the date of endorsement, except under certain conditions which included HUD approval of the prepayment. The notes further stated that, after making payments for 20 years, owners could prepay their mortgages in full without prior HUD approval. The deed of trust notes were printed on forms approved by HUD.

The prepayment rules as set forth in the notes reflected contemporaneous HUD regulations governing the Section 221 and Section 236 programs, specifically 24 C.F.R. §§ 221.524(a)(ii) and 236.30(a)(i) (1970).[4] Those regulations also contained language which generally reserved to HUD the right to make future amendments:

> The regulations in this subpart ... may be amended by the Commissioner at any time, and from time to time, in whole or in part, but such amendment will not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured....

24 C.F.R. §§ 221.749 and 236.30 (1970).

By the late 1980s, Congress became concerned that a large number of owners might take advantage of the prepayment clauses within a short period of time, thus drastically reducing the supply of low-income rental housing throughout the country. *See* S.Rep. No. 316, 101st Cong., 2d Sess. 105, *reprinted in* 1990 U.S.Code Cong. & Admin. News 5763, 5867. As a result, Congress enacted two pieces of legislation to directly counter the threat of massive prepayments. The first bill, the Emergency Low Income Hous-

---

**2.** This opinion, for the sake of convenience, uses the terms "mortgage" and "deed of trust note" interchangeably, although the court is aware of their distinctions, which are rooted in state law. *See Black's Law Dictionary*, 5th ed., at 373 (West 1979).

**3.** Plaintiffs also draw the court's attention to paragraph 12 of the regulatory agreement, which effectively placed a lien on the mortgaged property in favor of HUD:

> [T]o secure the Commissioner because of his liability under the endorsement of the note for insurance, and *as security for the other obligations under this Agreement*, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they might receive or be entitled to receive from the operation of the mortgaged property.... Until a default is declared under this

Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

**4.** The language in the Section 221 regulations regarding mortgage was essentially the same as that in the Section 236 regulations, which in pertinent part stated:

> **§ 236.30 Prepayment privileges.**
> (a) *Prepayment in full—(1) Without prior Commissioner consent.* A mortgage indebtedness maybe prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where....
> (ii) [T]he prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage....

ing Preservation Act ("ELIHPA") was enacted in 1987. Pub.L. 100–242, 101 Stat. 1877 (reprinted as amended at 12 U.S.C.A. § 1715 l (note) (West 1989)). ELIHPA effectively placed a two-year moratorium on prepayments in order to give Congress "breathing room" with which to devise a permanent solution. *Id.* at § 221(b). While it did not prohibit prepayments altogether, ELIHPA did require owners to apply to HUD for permission to prepay. *Id.* at § 222. ELIHPA authorized HUD to approve a prepayment only after making written findings that the prepayment would have minimal effects on the existing tenants, the local low-income housing market in general, and the local housing market for minorities. *Id.* at § 225.[5]

In 1990, Congress replaced ELIHPA with the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"). In addition to making the moratorium described above permanent, LIHPRHA authorized HUD to provide incentives to owners to maintain the affordability restrictions on their properties.[6] Pub.L. 101–625, 104 Stat. 4249 (reprinted at 12 U.S.C.A. § 4101 *et seq.* (West 1993)).[7]

Under LIHPRHA, whether a developer wishes to prepay the mortgage or to apply for incentives, the same procedures apply. The process is begun when a property owner files a Notice of Intent ("N.O.I.") with HUD, "in the form and manner" prescribed by the agency, with copies to be sent to state and local housing authorities, mortgagees and tenants. 12 U.S.C. § 4102. The property must then be appraised by two independent appraisers to determine its "preservation value," which in turn becomes a basis for any incentives which are ultimately offered to the owners. 12 U.S.C. § 4103, *see also* §§ 4104(a) and 4110(d). Within nine months after receiving an N.O.I. (or six months if the N.O.I. proposes to terminate affordability restrictions), HUD must send the owner a report containing the results of the appraisals and other information necessary for the owner to proceed. 12 U.S.C. § 4106. The owner must then, within six months, file a Plan of Action ("P.O.A.") with HUD indicating whether the owner wishes to prepay the mortgage (terminating the affordability restrictions), extend the affordability restrictions by requesting incentives, or sell the property to a buyer who will agree to maintain the affordability restrictions. 12 U.S.C. § 4107.

HUD must approve or disapprove a P.O.A. within 180 days of filing, provided the P.O.A. is not deficient. 12 U.S.C. § 4115(b). If a P.O.A. requesting incentives is approved after the 180 days have passed, LIHPRHA requires that the incentives be retroactive to

---

**5.** The text of § 225(a), which is specifically applicable to prepayment, reads in part as follows:

The Secretary may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that—

(1) implementation of the plan of action will not materially increase economic hardship for current tenants ... or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

(i) the availability of decent, safe and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

(ii) the ability of lower income and very low-income families or persons to find afforda-

ble, decent, safe, and sanitary housing near employment opportunities; or

(iii) the housing opportunities of minorities in the community within which the housing is located....

These limitations on HUD's discretion to approve prepayments have essentially been preserved at 12 U.S.C. § 4108.

**6.** The incentives authorized by LIHPRHA include authorization to increase ceilings on rents, an increase in the authorized annual rate of return from participating properties, financing of capital improvements, and equity loans, among other things. 12 U.S.C. § 4109.

**7.** LIHPRHA was passed upon the expiration of ELIHPA. Under § 203(a) of ELIHPA, the prepayment restrictions were to expire two years after its enactment, or February 5, 1990. 12 U.S.C. § 1715 l (note, § 203(a)). ELIHPA's expiration date was extended three times, the last time until November 30, 1990, or the date of the enactment of LIHPRHA, whichever was earlier. Pub.L. No. 101–494 at § 2. Congress eventually passed LIHPRHA on November 28, 1990.

180 days after the filing of the P.O.A. 12 U.S.C. § 4115(c). To ensure the timeliness of HUD's P.O.A. approval process, LIHPRHA allows an owner to seek relief in federal district court if HUD does not approve the P.O.A. within the statutory time limit. *Id.*

The plaintiffs in this case are general or limited partnerships who are owner-participants in the Section 221 or Section 236 programs.[8] The housing projects they own are all located in Culver City, California.

### Contentions of the Parties

Plaintiffs contend that by enacting ELIHPA and LIHPRHA, Congress breached a provision of an express contract which plaintiffs had entered into with HUD which would have allowed them to prepay their mortgages after 20 years without HUD approval. Furthermore, plaintiffs argue that by placing severe restrictions on the exercise of their prepayment rights, the government has prevented plaintiffs from putting their properties to more profitable use, effecting either a *per se* or a regulatory taking of private property without just compensation, in violation of the Fifth Amendment's Takings Clause. Finally, plaintiffs contend that HUD has unlawfully delayed implementing those provisions of ELIHPA and LIHPRHA which would provide plaintiffs with financial incentives for maintaining the affordability restrictions on their properties. Further, plaintiffs claim that HUD has unlawfully failed to provide for retroactive payment of incentives and unlawfully promulgated appraisal guidelines which result in valuations of their properties at less than fair market value.

Defendant counters that this court lacks jurisdiction to entertain both the contract and taking claims because plaintiffs have not exhausted administrative remedies that could ultimately lead to prepayment. At the same time, defendant contends that all but two plaintiffs lack standing to challenge the prepayment restrictions because they have filed N.O.I.'s or P.O.A.'s with HUD which indicate that they do not intend to prepay their mortgages but rather to seek the financial incentives which are available only to owners who agree to extend the affordability restrictions on their properties. In addition, defendant argues that the contract and taking claims are mooted with respect to the same two plaintiffs, Puente Park and Roscoe Park, because they have already completed binding agreements with HUD to maintain the affordability restrictions.

As for the merits of plaintiffs' contract claim, defendant argues that the claim must fail because plaintiffs have not established privity of contract with HUD in connection with plaintiffs' alleged prepayment rights. Alternatively, defendant contends that plaintiffs' contract claims should be barred by the sovereign acts doctrine or its corollary doctrine of "unmistakability." Lastly, defendant argues that even if plaintiffs otherwise establish the existence of an express or implied contract concerning their prepayment rights, relief should be denied on the grounds that HUD or its agents lacked authority to contractually bind the government to the 20–year prepayment provisions contained in the deed of trust notes.

With regard to plaintiffs' taking claim, defendant contends that plaintiffs have failed to establish that the prepayment restrictions instituted by ELIHPA and LIHPRHA effected a *per se* taking because plaintiffs' putative prepayment rights did not constitute a cognizable property right. Moreover, defendant argues, even if plaintiffs' rights with respect to prepayment can be characterized as "property rights," the prepayment restrictions imposed by ELIHPA and LIHPRHA were a justified exercise of "police power" intended to prevent injury to the public. As for plaintiffs' alternative regulatory taking theory, defendant argues that the court should reject plaintiffs' claim because it does

---

**8.** In addition to Cienega Gardens, the plaintiffs include the following: Cedar Gardens, Claremont Village Commons, Covina West Apartments, Del Amo Gardens, Del Vista Village, DeSoto Gardens, Independence Park Apartments, Kittridge Gardens I, Kittridge Gardens II, Las Lomas Gardens, Oxford Park, Parthenia Townhomes, Pioneer Gardens, Puente Park Apartments, Rayen Park Apartments, Reseda Park Apartments, Roscoe Park Apartments, St. Andrews Gardens, San Jose Gardens, Sherman Park Apartments, and Sunland Park Apartments.

not meet the necessary criteria for a regulatory taking established by case law.

Finally, defendant argues that plaintiffs' third claim, seeking damages for HUD's allegedly unlawful administrative delays and determinations, should be barred on jurisdictional grounds because ELIHPA and LIHPRHA do not mandate monetary damages or retroactive payment of financial benefits for HUD's allegedly unlawful actions. Consequently, defendant argues, plaintiffs have failed to identify a statutory, regulatory or constitutional basis for monetary relief, which is a prerequisite to jurisdiction under the Tucker Act, 28 U.S.C. § 1491.

## DISCUSSION

### A. *Exhaustion of administrative remedies; standing; mootness.*

■ A threshold consideration with regard to plaintiffs' contract and taking claims is defendant's contention that jurisdiction should be denied under "the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638, (1938); *Christopher W. v. Portsmouth School Committee,* 877 F.2d 1089, 1093 (1st Cir.1989). Defendant argues that HUD retains limited authority under LIHPRHA to approve a P.O.A. seeking prepayment under 12 U.S.C. § 4114 and, consequently, plaintiffs' case is fatally flawed because plaintiffs have never requested HUD approval for prepayment.

To require administrative exhaustion as a prerequisite to jurisdiction is appropriate in many cases in order to prevent "interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *see also McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). In a case whose facts were nearly identical to the present one, the United States Court of Appeals for the Fourth Circuit ordered that a challenge to the constitutionality of ELIHPA's prepayment restrictions be dismissed on the basis of the exhaustion doctrine. The court observed, "[B]oth the statute and the implementing regulations make clear that, under certain circumstances, HUD has the authority to grant [plaintiffs] the ultimate economic relief they seek—prepayment and withdrawal from the program." *Thetford Properties IV Ltd. Partnership v. HUD,* 907 F.2d 445, 448 (4th Cir.1990).

In reply, plaintiffs argue that LIHPRHA does not authorize HUD to adjudicate the particular claims sought in this case, *i.e.,* breach of contract damages and just compensation for a taking. Moreover, unlike the plaintiffs in *Thetford Properties,* who had filed N.O.I.'s with HUD seeking prepayment approval, the plaintiffs in the present case are not seeking declaratory or injunctive relief which would allow them to prepay their mortgages. The instant plaintiffs have, in fact, filed N.O.I.'s or P.O.A.'s with HUD seeking whatever preservation incentives LIHPRHA might afford them—not prepayment.

Plaintiffs further contend that to actually seek prepayment via the LIHPRHA administrative process would serve no useful purpose, under the circumstances. In order to be eligible to prepay, plaintiffs argue, an owner must be able to demonstrate, among other things, that prepayment would neither materially increase economic hardships of current tenants nor involuntarily displace them and that prepayment would not materially affect the local supply of housing for minorities or low-income persons. 12 U.S.C. § 4108; 24 C.F.R. § 248.141 (1994). Plaintiffs argue that they cannot sustain such a burden because they cannot truthfully assert that prepayment would have no material effect on either their tenants or the low-income housing market in California. In support of this position, plaintiffs have cited a recent report of the State of California, "Comprehensive Housing Affordability Strategy," which outlines the continuing crisis in the affordable housing market in that state.

Seeking prepayment would thus be futile because, lacking evidence that prepayment would not materially affect current tenants or the local housing market, LIHPRHA and HUD's own regulations would require HUD to deny a prepayment application from any of the instant plaintiffs.

At least with respect to plaintiffs's contract claim, it is not necessary to determine whether plaintiff's prepayment rights amounted to "contract rights" or something less binding on the government (though the court shall analyze that question below) in order to resolve defendant's exhaustion argument. There is no dispute that LIHPRHA negated that language in the deed of trust note which unambiguously permitted plaintiffs to prepay their mortgages in full *without HUD approval* after making payments for 20 years. The "administrative process" to which defendant would have the court bind plaintiffs is not one which would enable plaintiffs to exercise their prepayment rights as stated in their contracts, since under no circumstances may plaintiffs prepay their mortgages without HUD approval. It remains possible under LIHPRHA that HUD will approve a particular prepayment proposal, but such approval may only come after plaintiffs make the significant expenditure of time and money required to prepare and submit an N.O.I. and undergo possibly three separate appraisals. The legislation at issue gave HUD no authority to compensate plaintiffs for these added costs and delays, which would not be incurred had plaintiffs been permitted to simply prepay their mortgages without permission. The court concludes, then, that exhaustion is not required with respect to plaintiffs' contract claim, not because HUD is unlikely to approve prepayment but rather because no administrative procedure exists by which plaintiffs might obtain the relief which they seek, *i.e.*, damages for the alleged loss of an unrestricted prepayment right. *McCarthy v. Madigan*, 503 U.S. 140, 155, 112 S.Ct. 1081, 1092, 117 L.Ed.2d 291 (1992) (exhaustion not required when administrative apparatus could not award remedy sought by plaintiff); *see also Gibson v. Berryhill*, 411 U.S. 564, 575 at n. 14, 93 S.Ct. 1689, 1696 at n. 14, 36 L.Ed.2d 488 (1973). The court, therefore, may exercise its authority under the Tucker Act to adjudicate plaintiffs' contract claim.

When considering a taking claim, the court's concern regarding exhaustion of administrative remedies is more a question of ripeness than jurisdiction. *Williamson Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192–93, 105 S.Ct. 3108, 3119–120, 87 L.Ed.2d 126 (1985) (holding that a taking claim is not ripe until the administrative agency has arrived at a final decision); *see also Minority Media of Pahrump, Inc. v. United States*, 27 Fed.Cl. 379, 381–82 (1992). As defendant contends, under LIHPRHA the government retains limited discretion to approve P.O.A.'s proposing prepayment. *See* 12 U.S.C. §§ 4108 and 4114. On the other hand, the court has previously held that exhaustion is not necessary when pursuit of administrative remedies would be futile. *Conant v. United States*, 12 Cl.Ct. 689, 693 (1987). In the present case, if there is a realistic possibility that prepayment would be allowed with regard to a particular plaintiff in this case, administrative exhaustion may indeed be appropriate because it would not be futile. *See Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement") (citations omitted).

Although the instant plaintiffs insist that HUD would be likely—perhaps even compelled—to disapprove each of their applications for prepayment, should they pursue that option, the evidence in the record supporting their contention is insufficient. Defendant, moreover, disputes plaintiffs' assertion that prepayment disapproval is a foregone conclusion for any or all plaintiffs in this case. The court is reluctant to make findings of fact respecting the prepayment-approval prospects of each of the individual plaintiffs in this case based solely on a general report of inadequate housing supplies in California. A material factual issue must therefore be resolved, *i.e.*, whether any or all plaintiffs could reasonably expect to be al-

lowed to prepay their mortgages under the current regulatory regime.

Finally, defendant also argues that the majority of plaintiffs lack standing because they have filed P.O.A.'s that seek incentives with HUD but not prepayment, indicating their acquiescence to the prepayment restrictions as enacted. And with respect to two plaintiffs, the Puente Park and Roscoe Park partnerships, defendant argues that those plaintiffs' claims are moot because they have already completed agreements with HUD which explicitly extend the affordability restrictions on their properties over the entire original term of the mortgage, regardless of whether the mortgage remains outstanding.

■ With respect to plaintiffs' contract claim, the court must reject defendant's argument both as to standing and to mootness. The use agreement makes no explicit reference to plaintiffs' pre-ELIHPA unrestricted prepayment rights, so there is no basis for the court to conclude that by entering such an agreement plaintiffs were waiving any rights and claims they might have had for breach of contract damages based on the legislation. More importantly, HUD, under ELIHPA, has no authority to allow an unapproved prepayment to take place in accordance with the original contract provisions. As for whether defendant's standing or mootness argument should bar plaintiffs' taking claim, the court must defer reaching any conclusion on that issue until the court has been presented with the factual evidence necessary to establish the ripeness of plaintiffs' taking claim, as discussed above.

## B. *Breach of contract claim.*

As discussed above, plaintiffs allege that Congress's enactment of ELIHPA and LIHPRHA effectively breached the contract into which the parties had entered with HUD because ELIHPA and LIHPRHA placed restrictions on mortgage prepayments which would have otherwise been unrestricted after 20 years of payments.

### 1. *Privity of contract.*

■ Defendant's first defense is that HUD has no liability with regard to plaintiff's pre-

payment rights because there is no privity of contract between HUD and the owners. The prepayment provisions upon which plaintiffs base their claims were contained in the deed of trust notes entered into by plaintiffs and their lenders, not in the regulatory agreement into which HUD entered with the owners. Because HUD was not a party to the deed of trust notes, defendant argues, plaintiffs' putative prepayment rights are not enforceable against the government.

Defendant cites precedents from this court and its predecessor, the United States Court of Claims, which establish the general rule that there is no privity of contract between the United States and housing developers who enter contracts with local housing authorities for the construction of public housing, notwithstanding that local housing agencies who enter such contracts may be doing so under the direct supervision of HUD or that their activities may be financed by HUD. "That the Federal Government has intimate control over a project, including prior approval of plans and costs, does not establish liability. . . ." *Marshall N. Dana Construction, Inc. v. United States,* 229 Ct. Cl. 862, 863, 1982 WL 26554 (1982) (citing *Correlated Development Corp. v. United States,* 214 Ct.Cl. 106, 117–18, 556 F.2d 515, 519 (1977)). *See also Housing Corp. of America,* 199 Ct.Cl. at 710, 468 F.2d at 924; *National Leased Housing Assn. v. United States,* 32 Fed.Cl. 454, 456–57 (1994).

The court notes that the putative contractual arrangements at issue in *Dana Construction, Correlated Development, Housing Corp. of America* and *National Leased Housing* did not contain an express written agreement similar to the regulatory agreement into which plaintiffs and the government have entered into in this case, nor did those cases involve an express written agreement analogous to the specific agreement here at issue, *i.e.,* the rider to the deed of trust note allocating prepayment rights between HUD and the plaintiffs. By contrast, in *Dana Construction* and the other cases, the court was faced with a two-tiered contracting system under which, in its first tier, HUD would enter a contract with a local public housing agency to provide federal

funding for that agency's low-income housing activities. The local agency, in turn, would distribute that money pursuant to second-tier contracts which the local agency entered directly with housing builders or suppliers. *Dana Construction,* 229 Ct.Cl. at 862, n. 1. *See also Correlated Development,* 214 Ct.Cl. at 108–09, 556 F.2d at 517–19; *Housing Corp. of America,* 199 Ct.Cl. at 708–09, 468 F.2d at 923–24; *National Leased Housing,* 32 Fed.Cl. at 456–57. Although HUD supervised the local agency's activities, the court found no privity between the second-tier contractors and HUD. The present case is distinguishable from *Dana Construction* and related cases because of the absence here of a two-tiered contracting system. Instead, plaintiffs in this case argue, HUD entered directly into an express agreement with the plaintiffs, and the terms of that agreement are embodied in the regulatory agreement and the deed of trust note to which the regulatory agreement refers.

In support of their position, plaintiffs contend that the deed of trust note and the regulatory agreement must be read together in order to find all the terms of the contractual arrangement entered into between plaintiffs and HUD.[9] Plaintiffs point out that essential terms of the regulatory agreement make explicit reference to terms of the deed of trust note, specifically: the obligations imposed by the regulatory agreement were described as being "[i]n consideration of the endorsement for insurance by [HUD]" of the deed of trust note; the regulatory agreement required owners to make all payments due on the deed of trust note in a timely manner (in addition to the identical obligation imposed by the terms of the note itself); the agreement required plaintiffs to set aside cash reserves to minimize the likelihood of a default on the deed of trust note, for which HUD would be liable to the bank under its endorsement of the note; and, most importantly, the regulatory agreement, by its terms, was to remain in effect as long as the deed of trust note remained outstanding, so prepaying the note would have the effect of terminating the regulatory agreement, to which the named parties are the parties in this case.

Plaintiffs also point out that the rider to the deed of trust note which contained the terms of prepayment was logically intended to give rights and obligations to plaintiffs and to HUD. As discussed earlier, the rider gave HUD the right to approve or disapprove prepayment prior to the first twenty years following HUD's endorsement, and the rider allowed prepayment without HUD approval after the first twenty years. Despite the fact that HUD was not a named party to the deed of trust note—the fact upon which defendant's privity argument rests—the rider gave the lender no right whatsoever to interfere with an owner's plan to prepay.[10] The rider gave that power only to HUD, and only permitted such interference during the

---

9. Appendix One of plaintiffs' reply brief in support of its motion for partial summary judgment is a declaration from Alan D. Ross, the attorney who represented Cienega Gardens and some of the other plaintiffs in this case at the original closings in 1970. His written description of the closings include the following:

> For each project in which I was involved, there was a closing which typically took place in the HUD offices in Los Angeles. At each closing, I represented the project owners, the HUD legal counsel represented HUD, and the bank or other lender supplying the mortgage loan had its own counsel or representative present. The contractor, architect, title insurer and corporate surety were also present. At each closing, the parties signed and exchanged the relevant documentation, including the Regulatory Agreement, the Building Loan Agreement, the Note and the Deed of Trust. The lawyer representing HUD presided over each of the clos-

ings and approved all of the documentation. Each closing concluded upon endorsement of the Note by an authorized agent of HUD.
For each transaction, language was included in the Note affording the project owner a right to prepay the debt evidenced by the Note with the prior approval of the Federal Housing Commissioner, except that after 20 years from final endorsement by HUD, the project owner had an unqualified right to prepay the debt evidenced by the Note without having to obtain the prior approval of the Federal Housing Commissioner. The language setting forth the project owner's prepayment right was supplied by HUD at the request of the Owner.

10. The deed of trust note *did* specify that the lender was entitled to an "adjusted premium charge," according to applicable housing regulations, in the event of prepayment, and the rider required plaintiffs to give the lender 30 days prior written notice of its intent to prepay.

first 20 years of the mortgage. Because the rider specifically allocated certain rights between HUD and plaintiffs, the fact that HUD was not a named party (except as an endorser) to the deed of trust note containing the rider is not dispositive of the issue of privity of contract between the parties in this action. The government's participation as a party to the deed of trust note is unnecessary to establish privity of contract with respect to plaintiff's prepayment rights.[11]

Thus, contrary to defendant's assumptions, the "express contract" upon which plaintiffs base their claim is not to be found solely in either the deed of trust note or the regulatory agreement. The two documents, which were signed contemporaneously, must be read together in order to determine the full intentions of the parties when they initially entered into their relationship. The Restatement of Contracts provides that "all writings that are part of the same transaction are interpreted together." *Restatement (Second) of Contracts*, § 202. *See also Resolution Trust Corp. v. FSLIC*, 25 F.3d 1493, 1499 (10th Cir.1994); *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir.1993) ("instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together" (quoting *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir.1991)). Applying this guidance to the facts recited above, the court finds that when the parties in this case entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note.

■ Having thus found privity of contract between the parties in this action, the court also finds, based on the facts now before it, that plaintiffs have established a breach of contract claim, as follows: By signing the regulatory agreement and the deed of trust note to which the regulatory agreement referred, plaintiffs promised to construct and maintain housing in accordance with the HUD's specifications, to accept only low- or moderate-income persons as tenants, to charge no higher rents than those permitted by HUD, to distribute profits to shareholders in accordance with specified limitations, to make timely payments on their mortgages and to maintain cash reserves to self-insure against mortgage default. These promises were made expressly to and for the benefit of the government, not third parties. In exchange, the government agreed to endorse and insure the mortgages (allowing plaintiffs to obtain either subsidized commercial loans or loans at favorable interest rates) and to allow plaintiffs to free themselves of HUD's regulatory strictures after the first 20 years. Accordingly, the court finds that Congress, by enacting ELIHPA and LIHPRHA, breached the government's contracts with plaintiffs with respect to their prepayment rights.

It now remains to be determined whether the government may escape contract liability via the remaining defenses it has raised: the sovereign acts doctrine, the unmistakability doctrine, and lack of contracting authority.

### 2. *Sovereign Acts and unmistakability.*

■ The next defenses which the government has raised in its attempt to defeat plaintiffs' breach of contract claims are the sovereign acts doctrine and its corollary, the so-called "unmistakability" doctrine. "Under [the sovereign acts] doctrine, the government is not contractually liable for acts taken in its sovereign capacity for the public good." *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir.1990) (holding that the Uranium Mill Tailings Radiation Control Act and its regulations were sovereign acts undertaken for the public good and could not be a basis for plaintiff's breach of contract claim), *cert denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16, 25–29 (1984). The rationale behind this rule has been as follows:

11. At oral argument plaintiffs' counsel stated that its position was also supported by the court's recent decisions concerning third-party beneficiaries in *Schuerman v. United States*, 30 Fed.Cl. 420 (1994) and *National Sur. Corp. v. United States*, 31 Fed.Cl. 565 (1994). Since the court has not based its conclusion as to the contract claim on a third-party beneficiary theory, discussion of the applicability of those cases is unnecessary.

"[C]ontractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign.... [C]ontracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (citation omitted) (hereafter, "POSSE").

■ *POSSE* is also frequently cited for the unmistakability doctrine, under which "sovereign power ... will remain intact unless surrendered in unmistakable terms." *Charter FSB v. Office of Thrift Supervision,* 976 F.2d 203, 211 (4th Cir.1992) (quoting *POSSE* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). It was based on the unmistakability doctrine that the United States Court of Appeals for the Eighth Circuit refused to declare that ELIHPA unconstitutionally denied similarly situated plaintiffs due process of law in *Parkridge Investors Ltd. Partnership v. Farmers Home Administration,* 13 F.3d 1192, 1198 (1994).

In support of its unmistakability argument, defendant argues that because the contemporaneous HUD regulations, 24 C.F.R. §§ 221.749 and 236.30 (1970), quoted above, expressly reserved to HUD the right to amend its regulations in the future, HUD did not "unmistakably" surrender the government's power to alter plaintiffs' putative prepayment rights. As defendant shows, those regulations only provided assurance to mortgage lenders that their contract rights would be protected in the event of later regulatory change. It provided no similar assurances to mortgage borrowers, such as the instant plaintiffs.

■ With respect to the sovereign acts doctrine, as plaintiffs maintain, the general rule is that the sovereign acts defense is inapplicable when the "sovereign act" in question is one by which the government has sought to excuse itself from existing contractual liabilities. *See Freedman v. United States,* 162 Ct.Cl. 390, 402, 320 F.2d 359, 366

(1963) ("The doctrine ... does not relieve the government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused"), and the cases cited therein. *See also Everett Plywood Corp. v. United States,* 227 Ct.Cl. 415, 428–29, 651 F.2d 723, 731 (1981) (holding the government liable for unilaterally terminating a contract for the removal of timber after determining that continuing performance would result in severe environmental damage); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 768, 572 F.2d 786, 817 (1978) (holding that the doctrine does not insulate the government from liability when the government has taken actions which "were not actions of public and general applicability, but were actions directed principally and primarily at plaintiffs's contractual right" under an oil exploration lease).

■ In the present case, as in *Sun Oil* and *Everett Plywood,* the court is confronted with government actions undertaken specifically to impede or frustrate the exercise of contractual rights. Moreover, as in *Sun Oil* and *Everett Plywood,* the government cannot be excused from liability merely by invoking a laudatory motivation as the basis for breaching a contract. An act of the government does not qualify as a sovereign act merely because it was undertaken for the public good; the act must also be shown to be generally applicable to the public, contractors and non-contractors alike. *See also Ottinger v. United States,* 116 Ct.Cl. 282, 285, 88 F.Supp. 881, 882–83 (1950). Here, there is no dispute that the prepayment restrictions contained in ELIHPA and LIHPRHA were enacted specifically to impede property owners' exercise of prepayment rights under contracts entered into by HUD in the Section 221 and Section 236 programs.[12] On that basis, the sovereign acts doctrine is inapplicable in the present case.

The other cases upon which defendant relies are distinguishable from the facts now before the court. In *Atlas,* the court held that the legislation and regulations at issue (concerning the disposal of uranium mill tail-

---

12. *See* S.Rep. 101–316 at 105–117, *reprinted in* 1990 U.S.Code Cong. & Admin. News 5763 at 5867–79.

ing piles) were enacted for public safety reasons and not to modify existing contracts with plaintiffs, despite the added costs which the legislation and regulations imposed upon them. 895 F.2d at 754. In *Hedstrom,* the plaintiffs sued for breach of contract after Congress passed legislation ordering the Secretary of Agriculture to terminate their timber contracts in the Boundary Waters Canoe Area Wilderness ("B.W.C.A.W."). The court opined that the government's explicit breach could be excused on the grounds that the legislation, as a whole, affected "both commercial and recreational" users of the B.W.C.A.W., thus satisfying the "public and general applicability" requirement. Significantly, however, the court decided the case on alternative grounds—a taking theory— since the legislation called for the payment of "just compensation" to parties whose timber contracts were affected by the legislation. *Hedstrom,* 7 Cl.Ct. at 26.

As for the unmistakability doctrine, plaintiffs point out that courts have applied it to block the government's liability only in cases where the complainant has sought declaratory or injunctive relief from the government's exercise of its sovereign powers. The doctrine provides no defense to a claim for breach of contract damages. *Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953 (Fed.Cir.1993); *American Satellite Co. v. United States,* 998 F.2d 950 (Fed.Cir.1993). Thus, defendant's reliance on *Parkridge* to support its unmistakability argument is misplaced. In *Parkridge,* the plaintiffs sought relief, on constitutional grounds, from the implementation of ELIHPA's prepayment restrictions. Unlike the plaintiffs in *Parkridge,* the plaintiffs at bar do not seek to enjoin enforcement of ELIHPA or LIHPRHA's prepayment restrictions, but merely seek monetary compensation for the loss of their substantially unfettered contractual right to prepay. The unmistakability doctrine, therefore, has no application to their case. That result is not changed by the regulatory language of reservation discussed above, from 24 C.F.R. §§ 221.749 and 236.30 (1970) ("The regulations in this subpart ... may be amended by [HUD] at any time, and from time to time, in whole or in part....") since that language

merely expresses the truism that the government is always free to change applicable laws. While the regulations cited by defendant also provide express assurances to the primary beneficiaries of HUD mortgage insurance—*i.e.,* mortgage lenders—in the event of regulatory amendments, those rules do not disclaim any potential contract liability *vis-à-vis* mortgagors.

### 3. *Lack of authority.*

Defendant's final argument with respect to plaintiffs' contract claim is that even if HUD intended to promise plaintiffs that they could repay their mortgages regardless of future legislation restricting them from doing so, this promise would be unenforceable for lack of express authority from Congress. In support of this argument, defendant has cited *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); and *Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598 (D.C.Cir.1992). The court has examined each of these authorities and found them to be inapplicable to the present case, for the reasons discussed below. Finding no other persuasive authority to support defendant's position concerning HUD's lack of contracting authority, the court concludes it is without merit.

*Federal Crop Insurance* stands for the proposition that one who deals with a government agent bears the burden of determining that the agent is authorized to bind the government. 332 U.S. at 384, 68 S.Ct. at 3. The court does not now dispute this principle, but finds it inapposite to the present case because there is no information in the record suggesting that the HUD agents who entered agreements concerning the 20-year prepayment rule were not authorized to do so. As discussed earlier, contemporaneous HUD regulations at 24 C.F.R. §§ 221.749 and 236.30 (1970) expressly permitted a 20-year prepayment rule as described in the riders to plaintiffs' deed of trust notes. Moreover, while it does not appear that HUD was ever required by statute to permit

mortgagors to prepay after 20 years, the legislation enacting the Section 221 and Section 236 programs nonetheless gave HUD broad discretion "to make such rules and regulations, to enter into such agreements, and to adopt such procedures as [it] may deem necessary or desirable to carry out the provisions of [Section 236]." 82 Stat. at 499–500; *see also* 68 Stat. 600–01 (concerning Section 221). In giving HUD such discretion, therefore, Congress authorized the 20-year prepayment rule at issue in this case.

■ *Richmond*, on the other hand, conveys the general rule that a person claiming entitlement to a government benefit cannot use erroneous or unauthorized information given by a government employee to estop the government from disputing the entitlement. 496 U.S. at 430–34, 110 S.Ct. at 2474–76. *Richmond* is inapplicable simply because plaintiffs are not relying on an estoppel theory to advance their cause.

■ The third case which defendant cites, *Transohio*, is a nonbinding precedent which states that "An agency ... cannot contract away Congress's sovereign power to regulate unless Congress has clearly and unmistakably empowered the agency to do so." 967 F.2d at 622. To the extent that the D.C. Circuit meant that an agency could not, by regulation, preempt the effect of future legislation, this court does not disagree; the principle is essentially the same one enunciated by the Supreme Court in *POSSE*. As with *POSSE* and *Parkridge*, however, the plaintiffs in *Transohio* were seeking injunctive relief from the application of statutes which frustrated an agreement into which plaintiffs had previously entered with a government agency. As discussed above, the plaintiffs at bar seek breach of contract damages, not injunctive relief, and on that basis *Transohio* is inapplicable.

Although the court has found a contractual breach, the factual record now before the court contains no evidence on which the court could assess damages. For that reason, trial is necessary with regard to the contract claim for the purpose of determining damages.

**C. *Taking claim.***

■ The Takings Clause of the Fifth Amendment guarantees that private property shall not be taken for public use without just compensation. This provision was "designed to bar [the] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). In support of their taking claim, plaintiffs argue that they have suffered either a *per se* taking of their property or, alternatively, a regulatory taking without just compensation. Both theories are based on the fact that ELIHPA and later LIHPRHA took away plaintiffs' previously unfettered right to prepay their mortgages and withdraw their properties from the federal housing programs.

**1. *Prepayment as a property right.***

■ Before proceeding with a detailed analysis of plaintiffs' alternative taking claims—and assuming that plaintiffs prove their cause is ripe for adjudication at trial—the court must next determine whether the prepayment restrictions which aggrieve plaintiffs affect a "property right." Since the court has already found that plaintiffs' right to prepay their mortgages was a contractual right, and since that contractual right directly concerned plaintiffs' interests in their property, it is logical also to find that when the government imposed restrictions on plaintiffs' ability to prepay their mortgages and to liberate their properties from federal regulations connected to their mortgages, those restrictions affected a "property right." "In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government." *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed.Cir. 1991) (emphasis in original) (citations omitted).

■ *Hendler* makes clear that the property right of "exclusive possession" can be implicated both in the context of a *per se* taking and in the context of a regulatory taking. *Id.* at 1374–75. In the present case,

plaintiffs' exclusive possessory interest in their property has been implicated by the continuing presence of low-income tenants, and that is the basis of plaintiffs' *per se* taking claim.

Again assuming that plaintiffs establish ripeness at trial, the prepayment restrictions also appear to interfere with plaintiffs' exclusive possessory rights in a regulatory taking sense. If, as applied, the prepayment restrictions compel any plaintiff to extend the regulatory agreement beyond the first 20 years of the mortgage (*i.e.*, longer than plaintiffs could have expected under the terms of their agreement with the government), then that plaintiff has been denied exclusive possession of his property because HUD has retained a substantial, controlling interest in the property, by virtue of the regulatory agreement. As discussed earlier, the regulatory agreement severely limits the uses to which a plaintiff may put his property. The court thus finds that plaintiffs have identified a property right sufficient for analysis in the regulatory taking context; as discussed later, it remains to be seen whether the government's regulatory imposition on plaintiffs' property is of the type which, under applicable case law, requires compensation.

### 2. Per se taking.

■ In characterizing their injury as a *per se* taking, plaintiffs argue that the continued tenancy by government-approved persons, on government-approved terms, constitutes the kind of "permanent, physical occupation" which is tantamount to a physical, or *per se*, taking of their property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). If a plaintiff can establish that government action is a *per se* taking, there is no need to balance the public benefit of the government action against the private burden borne by the plaintiff, since a *per se* taking interferes with the owner's

fundamental possessory rights with respect to the property. *Loretto*, 458 U.S. at 434–35, 102 S.Ct. at 3175 (a *per se* taking "occurs without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner"); *Hendler*, 952 F.2d at 1374.

■ In light of the authorities cited by plaintiffs, however, their contention that the continued presence of low-income tenants on their properties constitutes a "permanent, physical occupation" is unpersuasive. In both *Loretto* and *Hendler* the alleged "physical occupation" resulted directly from a physical invasion of the plaintiffs' property, either at the behest of the government (in *Loretto*) or by government officials (in *Hendler*).[13] In both cases, property owners were prohibited from interfering with the invasion and from disturbing equipment which the invaders had left behind on the plaintiffs' property. In both cases, the court found a resulting *per se* taking for which the Constitution mandated just compensation, notwithstanding the degree of actual damage.

The facts in the instant case are sufficiently distinguishable from those in *Loretto* and *Hendler*, such that the court must view those cases as inapposite. In the present case plaintiffs have not demonstrated any physical invasion analogous to the undisputed invasions which occurred in *Loretto* and *Hendler*. Instead, plaintiffs have complained only of the "continued presence" of low-income tenants past the date on which plaintiffs, exercising their prepayment rights, ought to have been able to evict low-income tenants, either by increasing rents above HUD-mandated ceilings or by converting their apartments to some other more lucrative use.

■ Plaintiffs' taking theory is substantively similar to the one espoused by the appellants in *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1987), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281

---

**13.** The Supreme Court has made clear that, in the *per se* taking context, it is irrelevant that the act of "taking" at issue be done by the government "or instead by a party authorized by the [government]." *Loretto*, 458 U.S. at 432, n. 9, 102 S.Ct. at 3174, n. 9; *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct.

383, 392–93, 62 L.Ed.2d 332 (1979); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987); *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992).

(1988). In that case the appellants, owners of mobile home parks, claimed that a local ordinance imposing rent controls on mobile home pads transferred a perpetual, possessory interest in the property from landlord to tenant while allowing only below-market rents. 833 F.2d at 1276. The offending ordinance required the owners of the parks to offer tenants leases of unlimited duration, which could be terminated at will by the tenant but only for cause by the landlord. *Id.* at 1273. In practice, the ordinance allowed a tenant to transfer his right to use the pad at the regulated rental rates to a future tenant when selling the mobile home as installed on the pad, a practice which the landlord could do little to prevent. *Id.* at 1276–77. The Ninth Circuit concluded that the ordinance authorized a permanent, physical occupation of the landlord's property because it deprived the landlord of any meaningful power to exclude others and because it prohibited the landlord from making any "nonpossessory use of the property." *Id.* at 1277. Consequently the court held the ordinance to be an unconstitutional taking without just compensation, in violation of the Fourteenth Amendment.[14]

The Supreme Court explicitly overruled *Hall* in a later case, *Yee v. City of Escondido*, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). In *Yee*, the Court was faced with a city rent control ordinance which was similar to the one at issue in *Hall*. The petitioners in *Yee* argued that the rent control ordinance—viewed against the backdrop of California's Mobilehome Residency Law, which limited the ability of the owner of a mobile home pad to interfere with the sale of the mobile home in place upon the pad—effected a permanent physical occupation of their property. 503 U.S. at 521–24, 112 S.Ct. at 1526. The combined effect of the two laws, the petitioners argued, was to require the mobile home park owners to rent their pads to strangers—in other words, a state-authorized deprivation of the petitioners' "right to exclude," which is protected by the Fifth and Fourteenth Amendments.[15] *Kaiser Aetna v.*

*United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). The Court held that the ordinance was not a taking, finding that neither the ordinance nor the Mobilehome Residency Law compelled petitioners to rent their property. In fact, the court noted, the Mobilehome Residency Law allowed owners to evict their tenants with either six or 12 months notice. *Yee*, 503 U.S. at 526–28, 112 S.Ct. at 1528.

Notwithstanding the Court's finding that mobile home park owners had not suffered a permanent, physical occupation in *Yee*, plaintiffs in the case at bar now call the court's attention to a *dictum* in Justice O'Connor's majority opinion in which the Court suggested that "[a] different case would be presented were the statute, on its face or applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528, 112 S.Ct. at 1529 (citations omitted). Plaintiffs argue that their situation presents just such a case.

Plaintiffs have also drawn an analogy between the *dictum* in *Yee* and *Seawall Associates v. City of New York*, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059 (1989), *cert. denied*, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989). In *Seawall*, the New York Court of Appeals examined a New York City ordinance enacted to prevent the destruction, conversion or neglect of single-room occupancy buildings ("S.R.O.'s"), and the court found the ordinance to be a *per se* taking. Intended as a measure to prevent homelessness, the New York City ordinance placed a moratorium on the "conversion, alteration or demolition" of S.R.O. buildings. The ordinance further required owners to "rehabilitate and make habitable" every S.R.O. unit and to lease each unit to a bona fide tenant (the court referred to the latter requirement as a "rent-up" obligation). Stiff penalties were to be assessed in the event that an owner illegally demolished an S.R.O. building, converted it to non-S.R.O. use, or

---

**14.** The Fifth Amendment's Takings Clause applies to the states via the Fourteenth Amendment. *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

**15.** Only the local ordinance, and not California's Mobilehome Residency Law, was challenged in *Yee*, 505 U.S. at 531 n. 1, 112 S.Ct. at 1530, n. 1.

allowed an individual unit in an S.R.O. building to remain vacant for more than 30 days. 74 N.Y.2d at 100–01, 544 N.Y.S.2d at 544, 542 N.E.2d at 1061. Owners could escape these penalties only by paying the New York City housing commissioner a fee which represented the cost of replacing the S.R.O. units lost by the conversion or demolition; the fee could be reduced somewhat, at the commissioner's discretion, upon a showing by the owner that preservation of an S.R.O. unit could not be achieved with a reasonable rate of return to the owner. 74 N.Y.2d at 101, 544 N.Y.S.2d at 544–45, 542 N.E.2d at 1061–62.

The New York Court of Appeals agreed with Seawall Associates that the ordinance's requirements that they rehabilitate and "rent-up" their buildings and not convert them to more profitable use constituted a *per se* taking. As the court observed:

> [The ordinance] requires the owners to rent their rooms or be subject to severe penalties; it compels them to admit persons as tenants with all of the possessory and other rights that that status entails; it compels them to surrender the most basic attributes of private property, the rights of possession and exclusion.

*Seawall,* 74 N.Y.2d at 102, 544 N.Y.S.2d at 546, 542 N.E.2d at 1063, *citing Loretto,* 458 U.S. at 435, 102 S.Ct. at 3175–76; *Kaiser Aetna,* 444 U.S. at 179–80, 100 S.Ct. at 392–93. Plaintiffs in the present action analogize their cause to the plight facing the plaintiffs in *Seawall,* arguing that because ELIHPA and LIHPRHA make it impossible for them to prepay their mortgages and escape their regulatory agreements without HUD approval, they are forced to maintain their properties as low-income housing and, thus, forced "to rent their properties to strangers." *Seawall,* 74 N.Y.2d at 105, 544 N.Y.S.2d at 547, 542 N.E.2d at 1064.

Precedents of the New York Court of Appeals, of course, are not binding on the Court of Federal Claims. At the same time, however, this court cannot ignore the New York court's vast experience with landlord-tenant law. Accordingly, the court finds *instructive* the careful distinctions drawn in the court's opinion between the *Seawall* case and those cases in which either the New York Court of Appeals or the Supreme Court has upheld—against challenge on takings grounds—"the government's power to adjust landlord-tenant relationships." *Id.*

The *Seawall* court observed that the typical rent control and landlord-tenant regulations which it and the Supreme Court had upheld "merely involved restrictions imposed on *existing* tenancies where the landlords had voluntarily put their properties to use for residential housing. Unlike [the New York City ordinance] however, those regulations did not force owners ... to subject their properties to a use which they neither planned nor desired." *Seawall,* 74 N.Y.2d at 105, 544 N.Y.S.2d at 547–48, 542 N.E.2d at 1064–65 (emphasis added) For example, the court noted that in *Loab Estates, Inc. v. Druhe,* 300 N.Y. 176, 179, 90 N.E.2d 25 (1949), the ordinance in question prohibited the eviction of tenants unless provisions had been made for their relocation. And in *Bowles v. Willingham,* 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944), the Supreme Court upheld a federal rent control statute against a taking challenge because the statute did not force an owner to offer his or her property as rental accommodations. The *Seawall* court observed, "By sharp contrast to the statutes in *Loab Estates* and *Bowles,* [the S.R.O. ordinance] compell[ed] owners to be residential landlords [and required them to] rehabilitate and offer their properties for rent, as S.R.O. units, to persons with whom they have no *existing* landlord-tenant relationship." 74 N.Y.2d at 106, 544 N.Y.S.2d at 548, 542 N.E.2d at 1065 (emphasis added).

The essential distinction drawn by the *Seawall* court between the regulation of *existing* landlord-tenant relationships and a requirement, such as the one imposed by the New York City ordinance, that a landlord rehabilitate and "rent-up" vacant property against his will, is applicable to plaintiffs' claim for a *per se* taking in the case at bar. The prepayment restrictions under ELIHPA and LIHPRHA have the effect of providing existing tenants with added protections against losing their homes than they presumably had when owners had an unfettered right to prepay

their mortgages. Furthermore, unlike the "rent-up" obligations imposed by the local ordinance at issue in *Seawall,* the prepayment restrictions imposed by ELIHPA and LIHPRHA cannot fairly be characterized as forcing landlords to accept unwelcome tenants on previously vacant properties. Plaintiffs in the present case entered the landlord business voluntarily, more than 20 years ago, and low-income tenants—the "strangers" whose presence now offends their sense of justice—have been occupying their properties since they were built. Consequently, the court must find ELIHPA and LIHPRHA to be more analogous to the rent control ordinances upheld in such cases as *Yee* than to the S.R.O. ordinance struck down by *Seawall.*

It should also be noted that the plaintiffs in the *Seawall* case were situated somewhat differently from the plaintiffs in the present case. The *Seawall* plaintiffs were real estate developers who had purchased S.R.O. buildings with the specific intent of demolishing them or converting them to higher uses. Many of the plaintiffs had apparently acquired their properties before 1985, when the first version of the demolition moratorium was imposed. Before 1982, New York City actually granted tax abatements to *encourage* the demolition or redevelopment of S.R.O.'s, which were then considered substandard housing. The city underwent a change of heart, however, when confronted with a rising homeless population during the early-to-mid 1980's; the city council attributed the rising homelessness at least in part to the loss of S.R.O. units. 74 N.Y.2d at 99–100, 544 N.Y.S.2d at 544, 542 N.E.2d at 1061; *see also* 74 N.Y.2d at 119–20, 544 N.Y.S.2d at 556–57, 542 N.E.2d at 1073–74 (Bellacosa, J., dissenting). Thus, unlike the plaintiffs in the case at bar, the *Seawall* plaintiffs did not purchase their properties primarily to earn rents from S.R.O. tenants, but rather to see those tenancies through to termination so that the units could demolished or converted to non-S.R.O. purposes. As the New York court explained, above, the city ordinance forced S.R.O. owners into the role of landlord on a permanent basis. The prepayment restrictions of ELIHPA and LIHPRHA, however, do no such thing, since the plaintiffs at

bar entered the landlord business deliberately and long ago.

The court finds, therefore, that the case at bar is not the type to which the Supreme Court referred in its *Yee dictum* because the prepayment restrictions do not, on their face or as applied, "compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee,* 503 U.S. at 531, 112 S.Ct. at 1529. As *Yee* made clear, a landlord-tenant regulation may transfer some degree of interest from the landlord to the tenant without such a transfer rising to the level of a "permanent, physical occupation," just as it does in the rent control context. Since the effect of the prepayment restrictions in the present case is merely to enhance an existing tenant's possessory interest, the court must conclude that the prepayment restrictions do not rise to the level of authorizing a "permanent, physical occupation" within the meaning of *Seawall, Loretto* or *Hendler.* Consequently, plaintiffs have failed to show that they have suffered a *per se* taking within the meaning of the Fifth Amendment.

### 3. *Regulatory taking.*

Plaintiffs argue, in the alternative, that even if the prepayment restrictions do not amount to a *per se* taking, then the court should view them as a regulatory taking. A taking by regulation (or, as appropriate, legislation) may occur if the government, by placing burdens on property owners, goes "too far" in interfering with rights incident to property ownership. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

Plaintiffs have correctly identified the basic elements which must be considered when determining whether a regulation goes "too far": (1) the character of the governmental action, (2) the economic impact of the government's action, and (3) the extent to which the government's action interferes with plaintiffs' distinct investment-backed expectations. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

■ The courts have provided ample guidance for applying the three *Penn Central* factors in other cases. The first factor—the character of the governmental action—is a requirement that the alleged regulatory imposition be one which seriously interferes with a property right, but which is not otherwise authorized by constitutional or common law. Accordingly, actions which can be characterized as an exercise of "police power" have been distinguished from takings under the Fifth Amendment, not because such actions do not restrict the use of property but rather because its unrestricted use would be injurious to the public. *Allied–General Nuclear Services v. United States,* 839 F.2d 1572, 1576 (Fed.Cir.1988) (citation omitted), *cert. denied,* 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988); *see also Penn Central,* 438 U.S. at 125, 98 S.Ct. at 2659–60 and *B & F Trawlers, Inc. v. United States,* 27 Fed.Cl. 299, 304–05 (1992) (citations omitted). Similarly, the Fifth Amendment has been held not to limit the exercise of the government's power to abate a nuisance. *Lucas v. South Carolina Coastal Council,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *see also Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1178–79 (Fed.Cir.1994). And a local government's power to enact zoning regulations has usually withstood a Takings Clause challenge, even when such regulations prohibit the most profitable use of private property. *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (upholding a zoning ordinance barring industrial use); *Gorieb v. Fox,* 274 U.S. 603, 608, 47 S.Ct. 675, 677, 71 L.Ed. 1228 (1927) (upholding a requirement that portions of land parcels be left unbuilt); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909) (upholding height restrictions); *see also Florida Rock Indus. Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986) ("The regulation may allowably have some adverse effect on the market value, as of course is almost inevitable if the most profitable use is prohibited."), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (citations omitted) (hereafter *"Florida Rock I "*).

■ The second *Penn Central* factor, the economic impact of the regulation on the claimant, has been restated as "a threshold requirement that the plaintiff show a serious financial loss from the regulatory imposition," to the extent that the plaintiff has been denied "economically viable use" of his or her property. *Loveladies Harbor,* 28 F.3d at 1177; *see also Lucas,* — U.S. at —, 112 S.Ct. at 2893; *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147. The Federal Circuit, whose precedents are binding on this court, has also rejected the view that the "loss of economically viable use" criterion requires a plaintiff, in a regulatory taking case, to show that he or she has suffered a total loss of economic value in the property at issue. *Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1180–81; *see also Florida Rock Indus. Inc. v. United States,* 18 F.3d 1560, 1567–71 (Fed. Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (hereafter *"Florida Rock II "*). In this regard, the Federal Circuit has held that it is necessary and relevant for the court to consider whether the government, in imposing a regulation on a property owner, "acted fairly and reasonably, so that private parties can pursue their interests." *Florida Rock II,* 18 F.3d at 1571. The Federal Circuit further instructed:

[W]hen the Government acts as the intermediary between private interests to provide a mutually beneficial environment from which all benefit and in which all can thrive, the shared diminution of free choice that results may not rise to the level of constitutionally required compensation.

In addition, then, to a demonstration of loss of economic use to the property owner as a result of the regulatory imposition ... the trial court must consider: are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few? Are alternative permitted activities economically realistic in light of the setting and circumstances, and are they realistically available? In short, has the Government acted in a responsible way, limiting

the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?

*Florida Rock II,* 18 F.3d at 1571.

■ With regard to the third factor—the extent to which the regulation interferes with distinct investment-backed expectations, the Supreme Court has concluded that, to enjoy the protection of the Fifth Amendment, investment-backed expectations must be reasonable. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). As applied in *Monsanto,* the reasonableness limitation meant that a plaintiff's claim may not be based on an expectation that a government agency will, in its particular case, fail to comply with applicable statutes and regulations. *See also Golden Pacific Bancorp v. United States,* 15 F.3d 1066, 1074 (Fed.Cir.1994); *American Continental Corp. v. United States,* 22 Cl.Ct. 692, 696 (1991).

Although both parties have invoked the appropriate *Penn Central* test for a regulatory taking, neither plaintiffs nor defendant has briefed the court on the facts or the reasoning upon which Justice Brennan based his majority opinion; in applying the *Penn Central* test to the controversy now before the court, however, it is helpful to revisit that opinion in detail.

In *Penn Central,* the court was faced with a challenge to the New York City Landmarks Preservation Law, under which Grand Central Terminal in midtown Manhattan was designated an historic landmark worthy of preservation for its historic and cultural value. As the court observed:

> The New York City law is typical of many urban landmark laws in that its primary method of achieving its goals is not by acquisitions of historic properties, but rather by involving public entities in land-use decisions affecting these properties and providing services, standards, controls, and incentives that will encourage preservation by private owners and users. While the law does place special restrictions on landmark properties as a necessary feature to the attainment of its larger objectives, the major theme of the law is to ensure the owners of any such properties both a "reasonable return" on their investments and maximum latitude to use their parcels for purposes not inconsistent with the preservation goals.

438 U.S. at 109–10, 98 S.Ct. at 2652 (footnotes omitted). The owners of Grand Central Terminal challenged the preservation law under the Takings Clause after municipal authorities refused to grant them a permit to construct a 53–story skyscraper in the space above the station. *Id.* at 117–19, 98 S.Ct. at 2655–57.

The court rejected the appellants' basic theory, finding that "the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." *Id.* at 130, 98 S.Ct. at 2662. Instead, the court used the tripartite analysis discussed above.

With regard to the character of the regulation—the first *Penn Central* factor—the court disagreed with appellant's efforts to distinguish the landmarks preservation law from (among other things) zoning ordinances. Appellants argued that unlike zoning ordinances, which affected property owners within whole geographic areas, the landmark preservation law targeted selected buildings for special treatment. The court found the distinction unpersuasive. As the court reasoned, "Legislation designed to promote the general welfare commonly burdens some more than others.... [Z]oning laws often affect some property owners more severely than others but have not been held to be invalid on that account. For example, the property owner in *Euclid* who wished to use its property for industrial purposes was affected far more severely by the ordinance than its neighbors who wished to use their land for residences." *Id.* at 133–34, 98 S.Ct. at 2664.

■ In the present case, the record before the court with respect to the character of the government action does not weigh sufficiently in plaintiffs' favor to sustain a motion for summary judgment. It is undis-

puted, of course, that the prepayment restrictions imposed by ELIHPA and LIH-PRHA substantially interfered with plaintiffs' ability to exercise whatever prepayment rights they might have had under their original deed of trust notes. And both parties also agree that the critical advantage that plaintiffs could obtain by prepaying their mortgages was that they would be able to charge market-rate rents or convert their properties to even more profitable uses—in other words, prepayment would allow plaintiffs to terminate their regulatory agreements and use their properties for purposes other than low-income housing. Furthermore, it is undisputed that Congress's avowed intention in restricting prepayment rights was to preserve existing low-income housing for its original purpose. As such, however, the prepayment restrictions appear to bear a striking resemblance to the New York City landmarks preservation law at issue in *Penn Central*. Like the landmarks preservation law, the prepayment restrictions in the present case are a regulatory imposition which encourage the preservation of the existing use of plaintiffs' property as low-income housing. Of course, it is not within the province of the court to weigh the relative societal merits between preservation of historic landmarks and preservation of the low-income housing market; that is the prerogative of the legislature. But to the extent that plaintiffs might distinguish landmark preservation from housing preservation on the grounds that the latter transfers some benefits to tenants at the expense of landlords—on top of the general social benefit of providing for adequate housing—such reasoning, as discussed above, was rejected by the Supreme Court as a ground for finding a taking in *Yee*.[16] Because of these factual consistencies between this case and *Penn Central* and *Yee*, therefore, the court is not yet convinced that the government, by enacting the prepayment restrictions, has exceeded the limits of what is permissible under the Fifth Amendment without just compensation.

Inasmuch as plaintiffs' case with regard to the first *Penn Central* criterion is weak at this stage, defendant's theory that the prepayment restrictions represent an exercise of the government's "police power" is even more attenuated. Defendant argues that Congress enacted the prepayment restrictions in order to avert a national crisis in the supply of low-income housing, and, on that ground, the government is not liable for compensation under the Takings Clause even if the restrictions are found to abrogate a "property right."

■ As discussed above, courts have long held government actions to be immune from a Takings Clause challenge when such actions are undertaken to protect the public health, safety or morals (or, alternatively, the public welfare). Accordingly, courts have accepted the police power defense for actions which resulted in the seizure or destruction of private property without compensation when such actions were undertaken, for example, to prevent the manufacture or sale of alcoholic beverages (*Mugler v. Kansas*, 123 U.S. 623, 666, 8 S.Ct. 273, 299, 31 L.Ed. 205 (1887); to prevent the spread of disease (*Miller v. Schoene*, 276 U.S. 272, 279–80, 48 S.Ct. 246, 247–48, 72 L.Ed. 568 (1928)); to prevent the spread of a conflagration (*B & F Trawlers*, 27 Fed.Cl. at 304–05), or to prevent nuclear proliferation (*Allied–General*, 839 F.2d at 1576). The police power defense has also succeeded where the government has prohibited a particular use of private property which would be injurious to the public (but not seized or destroyed property) as in *Jarboe–Lackey Feedlots, Inc. v. United States*, 7 Cl.Ct. 329, 338–39 (1985).

■ The government's reliance on the police power defense as justifying the action at issue in this case, however, is misplaced. By comparison with the precedents, the mere declaration by Congress or a government agency that a "housing crisis" exists would not appear to establish a *prima facie* case that the public's health, safety, morals or welfare are endangered to a point which would justify an abrogation of any or all of plaintiffs' property rights. To the contrary,

---

**16.** The court notes that in its *Yee* decision, the Supreme Court discussed, but did not decide, whether the Escondido rent control ordinance was a regulatory taking. 503 U.S. at 532–39, 112 S.Ct. at 1531–34.

a housing shortage appears to be precisely the kind of societal problem which calls for an inquiry into whether the restrictions on private property enacted to combat the problem "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U.S. at 49, 80 S.Ct. at 1569. It calls, in other words, for analysis as a taking and not as an exercise of police power.

With regard to the second *Penn Central* factor, *i.e.,* the economic impact of the regulatory imposition, the Supreme Court observed that the designation of Grand Central Terminal as a historic landmark "not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years.... So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel." 438 U.S. at 136, 98 S.Ct. at 2665. The Court further found that the continued use as a railroad terminal permitted Penn Central to earn a " 'reasonable return' on its investment," even though the landmark designation prohibited the most profitable use of the station. *Id.* The essential part of the "most profitable use" thwarted by regulation was appellant's full exploitation of its air rights above the station. The Court observed, however, that in addition to the landmark development restrictions, New York City had also implemented a program whereby a developer such as Penn Central could sell or transfer its lost development rights to other properties in the same neighborhood. The Court found that such transfer rights lessened the economic impact of the restrictions inherent in the landmark designation:

> While [transfer] rights may well not have constituted "just compensation" if a "tak-

ing" had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on applicants and, for that reason, are to be taken into account in considering the impact of regulation.

438 U.S. at 137, 98 S.Ct. at 2666 (citation omitted). On the other hand, the Federal Circuit has clarified that "the mere presence" of financial benefits in a regulatory scheme which is otherwise alleged to constitute a taking does not necessarily dispose of the issue of whether a taking has occurred. *Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1557 (Fed.Cir.1985), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991) (holding that the inclusion of a formula for determining just compensation in legislation restricting surface mining rights does not preclude court from finding a legislative taking).

Like the appellants in *Penn Central,* who showed that the denial of a permit to build a 53–story tower atop their train station cost them literally millions of dollars in potential rents, 438 U.S. at 116, 98 S.Ct. at 2655, plaintiffs in the present case argue that the economic impact of the prepayment restrictions can be measured in the millions of dollars, since the restrictions prevent plaintiffs from converting their properties to more profitable uses.[17]

Again like the appellants in *Penn Central,* the plaintiffs at bar are able to continue to use their property for the same business purposes they have always used it—their "primary expectation," in the words of Justice Brennan. Furthermore, as discussed earlier, LIHPRHA authorizes HUD to award financial incentives to property owners who

---

**17.** Although the *Penn Central* appellants ultimately lost their case, "economic impact" evidence can be critical. In *Lucas,* for example, the petitioner had spent $975,000 to purchase two undeveloped parcels of oceanfront land, intending to construct homes on each parcel. His plans were consistent with the zoning ordinances then in effect. But in 1988, before Mr. Lucas could begin construction, the state passed legislation prohibiting new construction in an area which included both of Mr. Lucas's parcels of land. —— U.S. at ——, 112 S.Ct. at 2889–90.

Similarly, the Federal Circuit in *Loveladies* found that a corporation had been denied economically viable use of a 12.5 acre parcel of land when the Army Corps of Engineers refused to grant a landfill permit pursuant to federal wetlands regulations. The corporation's proposed development would have been permitted under the laws in place at the time the project was initiated. *Loveladies,* 28 F.3d at 1174. As a result of the permit denial, the value of the parcel was reduced from $2,658,000 to $12,500—a reduction of more than 99 percent. *Id.* at 1174–75.

agree to forbear prepayment or who seek prepayment but have their applications denied. In the terms of *Penn Central,* such incentives may mitigate the harsh economic impact of the prepayment restrictions, even though they would not necessarily be adequate as "just compensation" in the event of a taking.

■ Despite the similarities between *Penn Central* and the present case, the record now before the court is inadequate for the court to fulfill its fact-finding obligations with respect to the "economic impact" criterion. As discussed above, the Federal Circuit requires this court to base its conclusions regarding economic impact on a comprehensive factual inquiry which would include consideration of (1) whether the government acted "fairly and reasonably" in implementing the regulation affecting property rights; (2) whether the regulatory regime also provides "direct compensating benefits" and whether those benefits accrue mainly to the property or, instead, to the general public; and (3) whether there are "alternative permitted activities" available to plaintiffs in lieu of prepayment and whether those alternative activities are "economically realistic." *Florida Rock II,* 18 F.3d at 1571.

As it stands, the record of this case contains no information with which the court could determine whether the government has acted "fairly and reasonably" in imposing the prepayment restrictions on the plaintiffs at bar. With respect to whether ELIHPA or LIHPRHA provides "direct compensating benefits" which might mitigate the loss of any putative property rights or permits "economically realistic" alternative activities, it would be necessary to take into consideration the several financial incentives which LIHPRHA authorizes HUD to offer owners who agree to extend the affordability restrictions on their properties. The record before the court, however, contains no information by which the court could evaluate the economic effect of the availability of LIHPRHA incentives to the plaintiffs in this case. The court

believes that the factual record needed to dispose of this issue can be fully developed at trial.

■ As for the third and final *Penn Central* factor, the degree to which the regulatory imposition interferes with distinct and reasonable investment-backed expectations, defendant argues that plaintiffs' expectations, under the circumstances, were "unreasonable," applying the ruling made by the Supreme Court in *Monsanto,* 467 U.S. at 1005, 104 S.Ct. at 2874. Defendant has emphasized that plaintiffs operate in a highly regulated field, and, therefore, they should have expected that the government might change its mind about allowing plaintiffs to exercise the rights set forth in their deed of trust notes. The Eighth Circuit made the same suggestion in *Parkridge,* the case which challenged the constitutionality of ELIHPA's prepayment restrictions, finding:

> [I]t was foreseeable that the government might impair the partnership's contractual options in order to prevent the programs's purposes from being foiled. Therefore, we cannot agree that Parkridge's expectation of a continued, unrestricted right to prepay was "reasonable."

13 F.3d at 1199. This court cannot wholeheartedly agree with the Eighth Circuit's suggestion that the foreseeability of regulatory change, by itself, implies that plaintiffs have entertained unreasonable expectations. Plaintiffs' prepayment expectations were based on express language contained in their deed of trust notes and authorized by HUD. The prepayment clauses were consistent, moreover, with contemporaneous HUD regulations, and those regulations remained in force for the better part of the first 20 years of plaintiffs' mortgages. On that basis, the court cannot conclude that plaintiffs' expectations were "unreasonable."[18] The important question with respect to plaintiffs' expectations, therefore, is not whether they were "reasonable," but whether they were "investment-backed."

---

18. Despite the court's disagreement with certain portions of *Parkridge,* the court must point out that the Eighth Circuit's analysis of the reasonableness of Parkridge's expectations was not es-

sential to the court's ultimate disposition of that case because Parkridge sought to enjoin the implementation of ELIHPA—a remedy not available in a takings case in this court.

In support of their position, plaintiffs make the following assertions (in the words of Jona Goldrich, an investor in each of the 21 partnerships which are plaintiffs in this case):

> Because the partnerships intended to prepay the mortgages on the HUD projects after 20 years, they selected project locations which they believed would increase in value and allow them to attract market-rate tenants after the projects were free of HUD restrictions. Although there were available at that time numerous potential development sites on relatively inexpensive land in inner city neighborhoods and in less desirable suburban locations, the partnerships deliberately selected and paid a premium for desirable urban and suburban locations close to shopping, bus routes, schools and other amenities, in contrast to sites selected by most developers of HUD-insured properties.

Goldrich Declaration at paragraph 13.

Mr. Goldrich's statement alleging that he and his partners made special efforts to construct properties that would be more valuable once prepayment rights were exercised, is apparently an effort to satisfy the requirement that a taking claim be supported by "investment-backed expectations." In *Florida Rock I*, the Federal Circuit suggested that a relevant consideration in this context is to compare a property owner's initial investment with the property's fair market value subject to the regulatory imposition. 791 F.2d at 902. The slim factual record now before the court, however, does not permit such a comparison, so it is not yet clear to what extent Mr. Goldrich's investment in Cienega Gardens and the other properties has been diminished by the prepayment restrictions because the record does not reveal information concerning the value of the property before or after the imposition of the prepayment restrictions. Nor is it clear to what extent the amount initially invested in Cienega Gardens or the other properties was based on the possibility of prepayment in 20 years, as opposed to other considerations. Again, trial is needed in order for the court to adequately evaluate the effect of ELIHPA and LIHPRHA on plaintiffs' investment-backed expectations.

**D. Claims based on HUD's alleged statutory violations.**

In Count III of their complaint, plaintiffs seek damages for HUD's allegedly unlawful (1) delay in implementing regulations as required by LIHPRHA, (2) delay in processing requests for incentives authorized by the legislation, (3) failing to provide for retroactive payment of incentives, and (4) promulgating appraisal guidelines which result in value determinations below fair market value.

The court's recent opinion in *Anaheim Gardens v. United States*, 33 Fed.Cl. 24 (1995), thoroughly discusses the identical issues which the court has here numbered (1) and (3); in accordance with that opinion, those claims are hereby dismissed.

The *Anaheim* opinion did not reach any conclusions concerning the issues raised by numbers (2) and (4)—respectively, HUD's alleged delay in processing requests for incentives and promulgation of appraisal guidelines which result in value determinations below fair market value. With respect to the delays in processing requests for incentives, the court must dismiss this claim for lack of subject matter jurisdiction. LIHPRHA, at 12 U.S.C. § 4115, allows HUD 180 days to process a P.O.A. which requests incentives. At the close of that period, HUD must either approve the incentives or notify the applicant of the reasons for disapproval and of the actions that could be taken to meet the criteria for approval. *Id.* at § 4115(b)(1). The same provision, at subsection (c), also provides the exclusive remedy for untimely HUD action with respect to a P.O.A. According to that provision:

> If the Secretary [of HUD] does not approve a plan of action with the period under subsection (b) of this section, the Secretary shall provide incentives and assistance under this subchapter in the amount that the owner would have received if the Secretary had complied with such time limitations.... *An owner may bring an action in the appropriate Federal district court to enforce this subsection.* (Emphasis added.)

Thus, 12 U.S.C. § 4115(c) provides an exclusive district court remedy for HUD's allegedly delayed action in approving plaintiffs' requests for incentives. While it is true, as plaintiffs argue, that "a Tucker Act remedy exists unless there are unambiguous indications to the contrary," *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 13, 110 S.Ct. 914, 923, 108 L.Ed.2d 1 (1990), the court finds § 4115(c) to be sufficiently unambiguous so as to deny this court jurisdiction.

Finally, with regard to plaintiffs' contention that HUD has promulgated appraisal guidelines which allegedly deny plaintiffs' an appraisal based on the fair market value of their properties, the court must also dismiss this claim for lack of jurisdiction. This court has no authority to order HUD to adopt or change any particular regulation, nor may it declare any particular regulation invalid. In dismissing this claim, however, the court expresses no opinion as to whether plaintiffs may pursue an equitable remedy in another forum for the injuries they allegedly sustained.

### CONCLUSION

To summarize, trial is necessary in order to determine damages with respect to plaintiffs' breach of contract claim. Trial is also necessary to determine ripeness, liability and damages with respect to plaintiffs' taking claim. Plaintiffs' claim for damages with respect to HUD's allegedly unlawful or improper administrative actions is hereby dismissed.

IT IS SO ORDERED.